Nancy CUTTING, as the Administratrix of the Estate of Kenneth Cutting, and Nancy Cutting and Jeffrey Cutting, individually, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Francis B. Rauch, as Administrator of the Estate of Carl F. Rauch, Jr., and Francis B. Rauch, Individually, Plaintiffs,

v.

United States of America, Defendant.

Francis P. Siska, Executor of the Estate of Angelo Vella, Plaintiff,

v.

United States of America, Defendant.

Michael McEwen, Administrator of the Estate of Ralph L. McEwen, Jr., and Michael McEwen, Individually, Plaintiffs,

v.

United States of America, Defendant.

Statia A. Skwira, Administratrix of the Estate of Edward S. Skwira, and Statia A. Skwira, Marsha T. Yarrows, Edward S. Skwira, Jr., and Phillip E. Skwira, Individually, Plaintiffs,

v.

United States of America, Defendant.

Susan Lessard, Administratrix of the Estate of Stanley Jagodowski, Plaintiff,

v.

United States of America Defendant.

Nos. CIV.A. 99–40065–MAP, CIV.A. 99–30231–MAP, CIV.A. 00–30080–MAP, CIV.A. 99–30232–MAP, CIV.A. 00–30192–MAP, CIV.A. 00–30076–MAP.

United States District Court, D. Massachusetts.

June 11, 2002.

Robert H. Astor, Astor & Minardi, Springfield, MA, for Nancy Cutting, Jeffrey Cutting, Plaintiffs.

Michael T. Truscott, U.S. Dept. of Justice, Torts Branch, Civil Division, R. Todd Ingram, U.S. Department of Justice, Torts Branch, Civil Division, Clay R. Mahaffey, U.S. Department of Justice, Washington,

DC, for United States of America, Defendants.

*MEMORANDUM REGARDING DEFENDANT'S MOTIONS TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION (Civil Action No. 99–40065: Docket No. 28; Civil Action No. 99–30231: Docket No. 17; Civil Action No. 00–30080: Docket No. 19; Civil Action No. 99–30232: Docket No. 17; Civil Action No. 00–30192: Docket 16; Civil Action No. 00–30076: Docket No. 14)*

PONSOR, District Judge.

## I. *INTRODUCTION*

This memorandum addresses the court's power to hear to six civil cases that have been filed under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–80 ("FTCA"). Each of the suits seeks damages for the wrongful death of a patient who died while under the care of the Department of Veterans Affairs Medical Center in Leeds, Massachusetts (the "VAMC"), as a result of the criminal conduct of nurse Kristen Gilbert ("Gilbert").

Gilbert, a one-time employee of the VAMC, was indicted in 1998 for murdering four of her patients and attempting to murder three others by injecting them with the heart stimulant epinephrine. All of the current plaintiffs contend that the United States, through the VAMC, was at least partly responsible for the death of their loved ones. In its present motions, the Government does not address that ultimate issue. Instead, it claims that this court has no jurisdiction to hear these six cases because they were brought outside the applicable statute of limitations. In other words, the Government argues, these lawsuits were filed too late.

■ It is well established under the law that the United States, as an entity, may be sued only to the extent, and in the manner, that it consents to being sued. It has consented to be sued under the FTCA, but only if the claim is brought within two years after the claim "accrued." According to the Government, these six cases were brought more than two years after their accrual dates, and are therefore barred.

As the following discussion will show, this court is compelled to conclude that the Government is correct with regard to five of the six cases; this court has the power to hear only plaintiff Cutting's case (Civil Action No. 99–40065). Binding authority makes it clear that the other five cases were filed with the Department of Veterans Affairs too late to meet congressional statute of limitations requirements.

The court has reached this conclusion reluctantly, in view of the enormity of the loss suffered by these five plaintiffs and their families. It would, however, be false generosity to ignore a jurisdictional defect that is bound to be fatal to these cases eventually. The court's reasoning is set forth below.

## II. *GENERAL BACKGROUND*

"Because federal courts are courts of limited jurisdiction, federal jurisdiction is never presumed. Instead, the proponent—here, the plaintiffs—must carry the burden of demonstrating the existence of federal jurisdiction." *Viqueira v. First Bank,* 140 F.3d 12, 16 (1st Cir.1998). In deciding a motion to dismiss under Fed. R.Civ.P. 12(b)(1) challenging subject matter jurisdiction, the court may consider materials outside the pleadings. *See Gonzalez v. United States,* 284 F.3d 281, 288 (1st Cir.2002); *Heinrich v. Sweet,* 44 F.Supp.2d 408, 415 (D.Mass.1999)(noting that in motion to dismiss for lack of sub-

ject matter jurisdiction court "may (1) consider evidence submitted by the parties, such as depositions and exhibits; (2) entertain arguments not raised by the parties' memoranda; and (3) resolve factual disputes, if necessary."). Accordingly, the court has reviewed all the documents submitted in connection with this motion. While the facts particular to each plaintiff will be discussed in Section III below, some general background may be helpful.

The federal investigation into the VAMC began around February 1996. (Civil Action No. 00–30192, Docket 18, Exhibit E at 6). Assistant United States Attorney William Welch ("Welch") was the lead prosecutor, assisted by Special Agent Steven Plante of the Inspector General's Office at the Veterans Administration ("Agent Plante"). *Id.* In June of 1996, Trooper Kevin Murphy of the Massachusetts State Police ("Trooper Murphy") was recruited to assist Agent Plante. *Id.* at 5.

The investigation focused on patients who had died of cardiac arrest between January of 1995 and February of 1996. *Id.* at 7–9. Beginning in the fall of 1996, investigators began approaching families of some of these former patients for permission to exhume the bodies of the deceased. The Skwira family was first, and was approached in October, 1996. *Id.* at 10. From the exhumed bodies, investigators took tissue samples for analysis. *Id.* at 75.

The media began coverage of the investigation in July, 1996. For example, on July 17, 1996, an article in the *Daily Hampshire Gazette* with the headline "VA officials probe deaths" noted that "[a] federal probe into 'a higher than usual numbers of deaths' from cardiac arrest on one ward" of the VAMC was underway. (Civil Action No. 99–30231, Docket 17, Exhibit E). On August 1, 1996, an article in the same newspaper with the headline "VA nurse said a focus of the probe," disclosed that "investigators probing deaths at the U.S. Department of Veterans Affairs Medical Center are studying the role a nurse played in the care of those who died." *Id.,* Exhibit F. The article noted that while the unnamed nurse had not yet been charged with a crime, she was placed on leave "at about the same time that the VA's Office of Inspector General was called in to investigate what officials feared was a greater number of deaths due to cardiac arrest occurring on a particular ward during a particular shift than on others." *Id.* The same article made it known that the nurse in question had been arrested for trespassing, breaking and entering, and possession of burglary tools, and that her name appeared on the medical records of at least one veteran who had unexpectedly died of a cardiac arrest. *Id.*

In early August, the United States Attorney's Office issued a short press release confirming that, in fact, there was a Grand Jury investigation under way. (Civil Action No. 00–30192, Docket 18, Exhibit D at 25). Around the same time, an August 8, 1996 article in the *Daily Hampshire Gazette* reported that a Grand Jury had been taking testimony for about a month, that the Government had "sufficient information to (have brought) it to a Grand Jury," and that the investigation was "focusing on all deaths that occurred at the VAMC between fall 1995 and winter 1996." (Civil Action No. 99–30231, Docket 17, Exhibit G).

Gilbert was arrested on October 2, 1996 and charged with phoning in false bomb threats to the VAMC. (Civil Action No. 00–30192, Docket 18, Exhibit D at 45). Her name was made public in connection with that arrest, and she was identified by the papers as the subject of the ongoing investigation into the deaths at the VAMC. *Id.* at 45–46.

On October 23, 1997, Caroline Brandt ("Brandt") filed an administrative claim with the Department of Veterans Affairs for the death of her husband. (Civil Action No. 99–30231, Docket 22, Exhibit A). The actions of the Brandt family exemplify a course of conduct that fully satisfied the jurisdictional requirements. Brandt .alleged that her husband had inexplicably died of cardiopulmonary arrest, but had no heart problems. *Id.* The claim further alleged that he had a normal pulse and respiratory rate the day of his death, and that "[o]ther suspicious deaths occurred on the same ward at the VA Medical Center from the fall of 1995 to the Spring of 1996." *Id.* Brandt asserted that her husband's death "was the direct result of negligence and/or intentional acts of agent(s) and/or employee(s) of the VA Medical Center in Leeds, MA." *Id.* Gilbert was listed as a witness, but no specific allegations were made against her. *Id.* Following denial of her administrative claim, Brandt filed a timely complaint, which is now pending in this court and which the Government has not sought to dismiss.[1]

It is important to emphasize, in fairness to plaintiffs, that the process of proving that the victims had died of epinephrine poisoning was difficult. Epinephrine occurs naturally in the body as adrenaline, and investigators found it difficult to isolate toxicological evidence that a particular patient had been killed with a lethal injection by examining tissue samples exhumed months or years after the patient's death. Moreover, the tissue examination process was unprecedented, new instrumentation was employed for the first time, and test protocols had to be written. (Civil Action No. 00–30192, Docket 18, Exhibit E at 89). Several doctors and scientists worked with the Government on the toxicological and pathological aspects of the investigation, which was both expensive and time consuming. *Id.* at 84–87.

On May 20, 1998, Nancy Cutting ("Cutting") (Civil Action No. 99–40065) filed an administrative complaint with the Department of Veterans Affairs, alleging that her husband had "died of cardiac arrest caused as a direct result of the negligent and/or intentional acts of agents and/or employees of the VA Medical Center in Northampton, Massachusetts during a period of time up to and including February 2, 1996." (Civil Action No. 99–40065, Docket 28, Exhibit A). As will be seen, this filing satisfied the requirements of the statute of limitations. Following denial of the administrative claim, a timely lawsuit was filed with this court.

In the fall of 1998, the Grand Jury returned an indictment charging Kristen Gilbert with first degree murder and assault with intent to commit murder. The indictment was sealed for seven days so that the families involved could be informed. (Civil Action No. 00–30192, Docket 18, Exhibit E at 30). When the indictment was made public, the other plaintiffs now before the court filed administrative complaints in rapid succession. Francis Rauch ("Rauch") (Civil Action No. 99–30231) filed on December 23, 1998; Francis Siska ("Siska") (Civil Action No. 00–30080) on March 10, 1999; Michael McEwen ("McEwen") (Civil Action No. 99–30232) on March 18, 1999; Susan Lessard ("Lessard") (Civil Action No. 00–30076) on September 29, 1999; and Statia Skwira ("Skwira") (Civil Action No. 00–30192) on October 8, 1999.

---

1. Another lawsuit, arising out of the death of Henry Hudon, was filed even earlier, in 1998, C.A.98–30231, and likewise is not the target of any motion to dismiss. Gilbert was eventually found guilty of murdering Henry Hudon.

Jury selection in the criminal case began on October 25, 2000, and trial commenced on November 20, 2000. On January 4, 2001, this court stayed the pending civil actions until the conclusion of the criminal proceedings. (Civil Action 00–30192, Docket 8 at 2). Gilbert was convicted of three counts of first degree murder and various lesser charges on March 14, 2001, and was sentenced to life in prison on March 26, 2001.

## III. *LEGAL STANDARDS*

### A. *FTCA*

As noted above, the United States cannot be sued without its consent. This doctrine of sovereign immunity is "deeply entrenched in American law" and "derives from the common law tradition that the king should be insulated from suit absent his consent." *United States v. Horn*, 29 F.3d 754, 761–762 (1st Cir.1994). Congress did give its consent to be sued in tort cases—*i.e.* cases seeking damages for death or injury caused by the acts of Government employees—in the FTCA, but with a strict condition: a tort claim is "forever barred" unless it is presented in writing to the appropriate federal agency "within two years after such claim accrues." 28 U.S.C. § 2401(b). The Supreme Court has noted that this two-year requirement "is the balance struck by Congress in the context of tort claims against the Government." *United States v. Kubrick*, 444 U.S. 111, 117, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979).

▮ Thus, plaintiffs who wish to seek damages against the United States for injury caused by the negligent or intentional act of a Government employee must initiate the process by presenting an administrative claim within two years after their cause of action accrues. *Gonzalez v. United States*, 284 F.3d 281, 288 (1st Cir.2002).

"[C]ompliance with this statutory requirement is a jurisdictional prerequisite to suit that cannot be waived." *Id.* Put simply, if a claim is filed too late, the court has no power to hear it. Federal courts derive their power to hear tort claims against the United States from the FTCA and must dismiss those claims that are not timely filed. *Id.* If the administrative claim is submitted within the proper time, then the Government has six months to review the claim. 28 U.S.C. § 2675(a). If the claim is denied, the injured party then has six months to file a lawsuit. 28 U.S.C. § 2401(b).

In weighing whether a claim has been filed in time, the key question always is: when did the claim "accrue"?

The answer to this question is sometimes simple. "The general rule is that a tort claim accrues at the time of the plaintiff's injury." 284 F.3d at 288. As discussed in more detail below, each of the six plaintiffs in this case was "injured"— through the death of their loved one— more than two years prior to the time that they filed an administrative claim with the Department of Veterans Affairs. Therefore, the Government contends that this court has no subject matter jurisdiction over any of these cases, and that all six complaints should be dismissed.

### B. *Discovery Rule*

Plaintiffs argue that the court's jurisdiction is preserved by the "discovery rule" exception to the usually strict two-year statute of limitations. Although the "discovery rule" has been in existence for some time, the seminal case describing its contours in the context of the FTCA is *United States v. Kubrick*, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979). There, the Supreme Court confirmed that the FTCA's statute of limitations may be "tolled" (*i.e.*, held in abeyance) in a medical

malpractice case when the plaintiff remained ignorant of (1) the fact that he was injured and (2) the cause of the injury, until less than two years prior to filing his claim. *Id.* at 120, 100 S.Ct. 352. As the Court explained, that a plaintiff "has been injured in fact may be unknown or unknowable until the injury manifests itself; and the facts of causation may be in the control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain." *Id.* at 122, 100 S.Ct. 352.

Having established this general principle, however, the *Kubrick* Court reversed a Ninth Circuit decision holding that, in effect, a plaintiff's "ignorance of his legal rights" was sufficient to toll the statute of limitations. *Id.* The Supreme Court noted that the *Kubrick* plaintiff knew both that (1) he was injured (he had hearing loss); and (2) that it was "highly possible" that the injury was caused by the treatment he had received at the Government hospital. *Id.* at 114, 100 S.Ct. 352. The Court held that knowledge of injury plus cause was sufficient to start the clock under the discovery rule. *Id.* at 122–123, 100 S.Ct. 352. According to the Court, the plaintiff should have sought "advice in the medical and legal community," *id.* at 123, 100 S.Ct. 352, once he was "in possession of the critical facts that he had been injured and who had inflicted the injury." *Id.* at 122, 100 S.Ct. 352.

Although the discovery rule is primarily applied in the medical malpractice arena, some judges have invoked it in the wrongful death context as well. *See, e.g., Heinrich v. Sweet,* 44 F.Supp.2d 408 (D.Mass.1999)(applying doctrine to a wrongful death claim arising out of boron radiation experiments in the 1960's); *Diaz v. United States,* 165 F.3d 1337 (11th Cir.1999)(applying doctrine to wrongful death claim arising out of prison suicide). Thus, plaintiffs argue that this court may assert subject matter jurisdiction over their claims, if it finds that they did *not* possess sufficient facts to know that their claims had accrued until they were within the two-year window.

### 1. *Viability of Discovery Rule*

In response to the plaintiffs' arguments, the Government has offered a rebuttal comprised of several layers. As its first riposte, the Government contends that recent developments in the law foretell the imminent demise of the "discovery rule" in federal courts, in any form. Since Chief Judge Young decided *Heinrich,* the Supreme Court has addressed the discovery rule in two cases, with increasing levels of negativity.

First, in the context of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the Court recognized that federal courts "generally apply a discovery accrual rule when a statute is silent on the issue." *Rotella v. Wood,* 528 U.S. 549, 555, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000). However, the Court emphasized that "we have been at pains to explain that discovery of the injury, not discovery of the other elements of a claim, is what starts the clock." *Id.* The *Rotella* Court refused to find that the clock did not run on a RICO action until the plaintiff was aware "of the underlying RICO pattern." *Id.* at 557, 120 S.Ct. 1075. It held that "[a] RICO plaintiff's ability to investigate the cause of his injuries is no more impaired by his ignorance of the underlying RICO pattern than a malpractice plaintiff is thwarted by ignorance of the details of treatment decisions or of prevailing standards of medical practice." *Id.* at 556–557, 120 S.Ct. 1075. *Rotella* explicitly left open the possibility that simple occurrence of the *injury,* regardless of whether the injury was discovered or even discoverable, was sufficient to start the clock. *Id.* at 554

n. 2, 120 S.Ct. 1075. Thus, *Rotella* stands for the proposition that knowledge of injury alone, at least in the RICO context, is sufficient to start the statute of limitations clock.

*Rotella* is extremely ominous for plaintiffs here, for two reasons. First, if injury alone starts the two-year clock, regardless of any *knowledge* that the injury has occurred, all the plaintiffs filed their claims too late. Second, even if knowledge of the injury, regardless of any knowledge of *negligence* connected with the injury, is sufficient to start the two-year clock, then plaintiffs' claims must similarly be dismissed. In a wrongful death claim, plaintiffs, except in the rarest of instances, know of their injury (the death of the loved one) virtually immediately. All the plaintiffs in these cases knew of their decedents' deaths shortly after they occurred. In other words, all the plaintiffs clearly had "knowledge of the injury" more than two years before they filed their claims. Developing Supreme Court authority suggests that these facts alone may doom plaintiffs' claims.

The Court addressed the discovery rule again in 2001. In *TRW, Inc. v. Andrews*, 534 U.S. 19, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001), the Court rejected a finding that the discovery rule was applicable to the Fair Credit Reporting Act ("FCRA"). *Id.* at 444, 122 S.Ct. 441. The Court noted that the FCRA had an explicit exception to its statute of limitations; therefore, no implicit exception could be read in. *Id.* Justice Ginsburg, writing for a seven-justice majority, also made several observations that are relevant here. First, she noted that the Supreme Court had "not adopted as [its] own" the proposition that federal courts should apply "a discovery accrual rule when a statute is silent on the issue." *Id.* at 447, 122 S.Ct. 441. Second, she noted that the Supreme Court had only recognized the discovery rule in two contexts, "latent disease and medical malpractice, 'where the cry for such a rule is loudest.'" *Id.* Third, she appeared to suggest, in passing, that even where the discovery rule applied, accrual would always occur upon the plaintiff's knowledge of *injury*, regardless of any knowledge of the cause of the injury. *Id.* at 448, 122 S.Ct. 441. Justices Scalia and Thomas made it clear, concurring in the judgment, that they thought even "[t]he injury-discovery rule ... is bad wine of recent vintage." *Id.* at 452, 122 S.Ct. 441. Under the law as these two justices saw it, the limitations clock would always start when the injury occurred, regardless of whether the plaintiff even knew of the injury. *Id.*

Thus, the Government argues that in the wrongful death context the two-year clock must always begin to run at the time of death. Unlike the latent disease or medical malpractice context, there is, as noted above, virtually no possibility that the injury will occur substantially before discovery of the injury; death is rarely a hidden or latent injury that a plaintiff will need time to "discover." Starting the clock at the time of death would facially accord with the *Rotella* Court's admonition that "discovery of the injury, not discovery of the other elements of a claim, is what starts the clock," 528 U.S. at 555, 120 S.Ct. 1075, and the *TRW* Court's refusal to recognize the discovery rule outside the latent disease and medical malpractice contexts. 122 S.Ct. at 447.[2]

---

**2.** Indeed the Government's proposal is the rule in Massachusetts. The Commonwealth recognizes no "discovery rule" in the wrongful death context; the limitation period starts to run upon death, with no exceptions. *Pobieglo v. Monsanto Co.*, 402 Mass. 112, 116, 521 N.E.2d 728 (1988).

■ While the Government points to indications of a possible change in federal law in this area in the .future, this court will decline the invitation to discard the discovery rule in the wrongful death context in the absence of clearer authority. A guiding principle for federal trial judges is that "absent clear indication from the Supreme Court itself, lower courts should not lightly assume that a prior decision has been overruled *sub silentio* merely because its reasoning and results appear inconsistent with later cases." *Williams v. Whitley*, 994 F.2d 226, 235 (5th Cir.1993). This is doubly true when there is no explicit inconsistency, but merely a tentative indication of potential developments. Thus, *Kubrick* is good law, and discovery of injury alone is not sufficient to start the clock, at least in the medical malpractice context.

Moreover, this court will not assume that the application of the discovery rule in the wrongful death context is unwarranted, simply because no Supreme Court or First Circuit case contains an explicit holding to that effect.

For one thing, the facts of this case, charging hospital-based negligence or malfeasance, make it functionally identical to a malpractice case. In addition, the Eighth Circuit, despite evolving Supreme Court jurisprudence, recently applied the discovery rule in the wrongful death context. *See Garza v. United States Bureau of Prisons*, 284 F.3d 930 (8th Cir.2002). In sum, despite the Government's strong arguments, this court concludes that all plaintiffs survive the defendant's first salvo.

### 2. *Duty to Inquire*

The Government's second, and more effective, argument is that plaintiffs simply failed to file their lawsuits within two years after they had both knowledge of their injuries and sufficient indication of the injuries' cause. Some background will put this issue in context.

■ Once the Government has shown that the plaintiff's suit was facially time-barred, as in this case, the burden shifts to the plaintiff. To toll the clock under the discovery rule, "the plaintiff may show that he had no reason to believe he had been injured by an act or omission by the government." *Garza*, 284 F.3d at 934. Thus, the question for plaintiffs will be *when* they had "reason to believe" that the Government's negligence or misconduct was a cause of death.

■■ Before undertaking this individualized factual inquiry, a review of the legal landscape and standards governing the application of the discovery rule may be helpful. As noted, the crucial question is, when did the cause of action accrue? As the Eleventh Circuit has stated, "... in order for the claim to accrue, a plaintiff must have some indication that there may have been a government cause of the injury." *Diaz v. United States*, 165 F.3d 1337, 1340 (11th Cir.1999). "[E]ven in non-malpractice wrongful death cases, the causal link to the government may be obscured." *Id.; Ramming v. United States*, 281 F.3d 158, 162 (5th Cir.2001)(concluding that plaintiff's "awareness of a possible cause of action has two elements: (1) the existence of the injury; and (2) causation, that is, the connection between the injury and the government's actions.")(quotation omitted).

The issue of precisely how much knowledge is needed to trigger accrual bedevils discovery rule analysis. On the one hand, *some* indication at least of the defendant's responsibility must be available. On the other hand, the discovery rule puts a burden on plaintiffs to investigate once they have some reason to suspect foul play; accrual may occur long before there is firm

confirmation of the defendant's probable culpability.

■ In other words, the statute of limitations is only tolled if the factual basis for the claim is "inherently unknowable," or, put differently, "incapable of detection by the wronged party through the exercise of due diligence." *Gonzalez*, 284 F.3d 281, 288–289 (1st Cir.2002). Thus, "[o]nce a plaintiff knows of the injury and its probable cause, he/she bears the responsibility of inquiring among the medical and legal communities about whether he/she was wronged and should take legal action." *Id.* at 289.

This duty of inquiry is particularly strict when the injury at issue is a death. The First Circuit has noted that "the community disturbing event of death is likely to prompt immediate focus by third parties upon the cause thereof, thereby eliminating one possible delay in assembling a personal injury case." *Cadieux v. International Tel. & Tel. Co.*, 593 F.2d 142 (1st Cir.1979); *See also Pacheco v. Rice*, 966 F.2d 904, 907 (5th Cir.1992)(noting that the "requirement of diligent inquiry imposes an affirmative duty on the potential plaintiff to proceed with a reasonable investigation in response to an adverse event.").

In view of these authorities, the Government contends that the mere fact that all the decedents died unexpectedly, usually of heart attacks when no cardiac disease or weaknesses previously existed, was sufficient to give notice of "some indication" of cause, and trigger a duty of inquiry right at the time of death. This argument goes too far. As the Ninth Circuit recently noted, "a cause of action does not accrue under the FTCA when a plaintiff has relied on statements of medical professionals with respect to his or her injuries and their probable causes." *Winter v. United States*, 244 F.3d 1088, 1090 (9th Cir.2001). Plaintiffs in this case all assert that they initially relied on the VAMC's explanation of the cause of death, as imprinted on the respective decedent's death certificate. That initial reliance was reasonable. Something else was needed to trigger accrual.

■ As will be seen, substantial additional information was soon available to all plaintiffs, beyond the disturbing circumstances of the deaths, indicating negligence and malfeasance by VAMC employees. Even the least informed had notice by 1996 that the VAMC was under investigation for an unusually high number of cardiac-related deaths occurring during the period when their decedents died, and that a nurse there was the target of the investigation. As will by seen, this available information in due course triggered a duty to investigate. The "plaintiff need not know each and every relevant fact of his injury or even that the injury implicates a cognizable claim. Rather, a claim will accrue when the plaintiff knows, or should know, enough of the critical facts of injury and causation to protect himself by seeking legal advice." *Kronisch v. United States*, 150 F.3d 112, 121 (2d Cir.1998)(quotation omitted). "A claim does not accrue when a person has a mere hunch, hint, suspicion, or rumor of a claim, but such suspicions do give rise to a duty to inquire into the possible existence of a claim in the exercise of due diligence." *Id.* (citation omitted). *See also Drazan v. United States*, 762 F.2d 56, 59 (7th Cir. 1985) (holding that "knowledge of the government cause" was satisfied for purposes of the statute of limitations "when a reasonably diligent person in the tort claimant's position reacting to any suspicious circumstances of which he might have been aware would have discovered the government cause."); *Maggio v. Gerard Freezer & Ice Co.*, 824 F.2d 123, 128 (1st Cir.1987)(holding in fraud context that

" 'storm warnings' of the possibility of fraud trigger a plaintiff's duty to investigate in a reasonably diligent manner, and his cause of action is deemed to accrue on the date when he *should have discovered* the alleged fraud.") (citation omitted)(emphasis in original). Once due diligence should have disclosed sufficient facts to connect the Government to the injury, "the limitations period begins to run regardless of whether plaintiffs make inquiries, and regardless of whether they are correctly advised." *Gonzalez,* 284 F.3d at 289.

To justify their delay, plaintiffs cite *Stoleson v. United States,* 629 F.2d 1265 (7th Cir.1980). In *Stoleson,* the Seventh Circuit held in the medical malpractice context that the plaintiff's mere suspicion that the injury had been caused by the Government was insufficient to start the limitations clock when the plaintiff could not garner enough medical support for her claim. *Id.* at 1270. The plaintiff's cause of action only began to accrue when that "suspicion ripen[ed] into knowledge of . . . causation." *Id.* at 1270–1271. According to the *Stoleson* court, "any plaintiff who is blamelessly ignorant of the existence or cause of his injury shall be accorded the benefits of the discovery rule." *Id.* at 1269.

Unfortunately, *Stoleson* cannot help plaintiffs. It has been limited by the First Circuit as a case involving "a breakthrough in scientific or medical understanding." *Fidler v. Eastman Kodak Co.,* 714 F.2d 192, 200 (1st Cir.1983). No such breakthrough was required here for plaintiffs to discover that Gilbert was being investigated for the murder of patients at the VAMC.

Plaintiffs also cite *Attallah v. United States,* 955 F.2d 776 (1st Cir.1992). There, the plaintiffs sued the United States for the theft of property lost when a courier was murdered by Government agents. *Id.* at 778.

The facts in *Attallah,* however, are easily distinguishable. The courier's body was found partially decomposed in a Puerto Rican rain forest. *Id.* When one of the plaintiffs traveled to Puerto Rico to make inquiries, the authorities there advised him "that they had no leads as to who was responsible for the criminal acts committed." *Id.* Thereafter, the plaintiffs neither heard, nor could have discovered, anything more about the cause of the courier's death until more than four years later, when a federal Grand Jury indicted two former Customs agents for the murder. *Id.* One month after the indictment, the Government contacted the plaintiffs with a request that they testify for the prosecution. *Id.* Approximately seven months later, the Customs Service received a letter from the plaintiffs claiming damages under the FTCA. *Id.*

In those circumstances, the First Circuit found that the plaintiffs simply had no reason, and could discover no reason through the exercise of due diligence, even to guess that the United States through the two rogue Customs agents was responsible for the murder. *Id.* at 780. It was only when the indictment came down that the plaintiffs had any reason to suspect that Government agents were responsible for the murder and related theft; thus, their action accrued only at that time. *Id.*

As the following discussion will show, all of the plaintiffs now before the court were in a much different position. By 1996, each plaintiff knew (at least) that an investigation into the unusually high number of deaths from cardiac arrests at the VAMC was under way, that their decedents had suffered injury or death in the VAMC supposedly of cardiac problems during the precise time frame under investigation, and that a nurse there was the focus of the

probe. Thus, unlike in *Attallah*, evidence of Government culpability surfaced within a short time of the deaths.

Plaintiffs are certainly correct that by 1996 they could not have known *all* the details of the deaths, or been able to *prove* that Kristen Gilbert killed their loved ones specifically by injecting them with lethal doses of epinephrine. Even the Government with all its investigative resources did not obtain an indictment until 1998.

■ But the discovery rule does not toll the limitations period until the plaintiff is able to prove her case. *See Childers Oil Co. v. Exxon Corp.*, 960 F.2d 1265, 1272 (4th Cir.1992)(noting that plaintiff "may not know enough to win a verdict or even file a complaint on that first day, but that is why the law gives him a reasonable limitations period to investigate."); *Bradley v. United States*, 951 F.2d 268, 271 (10th Cir.1991)("To allow plaintiff to postpone accrual until he is passively informed by an outside source that his injury was negligently inflicted would serve to undermine the purpose of the limitations statute."). As the discussion below will show, the plaintiffs' knowledge of the investigation, the fact that it was targeting a nurse at the VAMC, and that it was looking into cardiac-related deaths, put each of the plaintiffs on inquiry notice. Within two years, each was required to file an administrative claim, yet only Hudon, Brandt, and Cutting did so. For this reason, the court lacks subject matter jurisdiction over the other claims.

## C. *Isolated Ignorance*

■ A final common issue may be disposed of here. Both plaintiffs McEwen and Lessard claim that only the knowledge of the *named* plaintiff is relevant to the issue of when their claim began to accrue. In each of their cases, the record supports an argument that the named plaintiff, for

unique reasons, happened to know less as a subjective matter about the mounting evidence of Government culpability than other potential administrators and family members. Therefore, these plaintiffs claim that their ignorance-in-fact tolled the statute of limitations, regardless of what the other potential administrators knew.

No support exists for this argument, and it flies in the face of both of applicable authority and practicality. No statute of limitations would have meaning if it were possible to avoid it simply by appointing a putative Rip Van Winkle as the estate administrator and plaintiff. Indeed, early last century, the Supreme Court found that the Federal Employers Liability Act's similar two-year statute of limitations "evidence[d] an intention to set a definite limit to the period within which an action may be brought under it without reference to the exigencies which arise from the administration of a decedent's estate." *Reading Co. v. Koons*, 271 U.S. 58, 63, 46 S.Ct. 405, 70 L.Ed. 835 (1926). This is in accord with the *Kubrick* Court's pronouncement that "the purpose of the limitations statute ... is to require the reasonably diligent presentation of tort claims against the Government." *Kubrick*, 444 U.S. at 123, 100 S.Ct. 352. Thus, the discovery rule does not require re-calculation of the statute of limitations in light of the subjective knowledge, or ignorance, of each potential plaintiff. The exception applies only when the cause of action is "inherently unknowable," *Gonzalez*, 284 F.3d at 289, not when it merely happens to be unknown by a particular potential plaintiff.

## IV. *CASE–SPECIFIC FACTS AND ANALYSIS*

■ In what follows, each of the motions to dismiss will be analyzed in accordance with the legal framework outlined above. The pivotal question in each case

will be when, as a factual matter, sufficient information was available to the plaintiffs to reveal a connection between the VAMC and the deaths. Put differently, the central question will be: at what time would a reasonably diligent person have had access to sufficient facts to justify obtaining professional assistance and proceeding with an inquiry? As noted, for each of the plaintiffs, this time will be found to be no later than when they became aware of the critical facts of the Gilbert investigation.

### A. Cutting (Civil Action No. 99–40065)

Kenneth Cutting ("Kenneth") had been hospitalized for some time at the VAMC with end-stage multiple sclerosis; he came down with a fever in late January, 1996. (Civil Action No. 99–40065, Docket 28, Exhibit B at 3518). As a result, the Cutting family visited him at the hospital. *Id.* At the time of the visit, Kenneth seemed to be in no danger, and doctors assured his wife and son that Kenneth was "getting well, he was getting better." *Id.*, Exhibit C at 49. However, on February 2, 1996, Kristen Gilbert telephoned Nancy Cutting, Kenneth's wife, at her home to inform her that her husband had died. *Id.*, Exhibit B at 3522. The death certificate listed "cardiac arrest" and "multiple sclerosis" as the causes of death. *Id.*, Exhibit E.

Nancy Cutting testified that Kenneth never had any heart problems or cardiac history that she knew of. *Id.*, Exhibit B at 3520. When she heard that he had died, she "was in shock ... [b]ecause he was fine. I didn't see any reason why he would be dead at that time, you know, why he would be passed away." *Id.* at 3522. Their son, Jeffrey Cutting ("Jeffrey") tes-

tified to his surprise as well, "if we were there the day before and he was fine, how come the next day he just died just like that, I mean, there was a question about that." *Id.*, Exhibit D at 43.

Nancy Cutting did not read any of the newspaper articles about the Gilbert investigation. *Id.*, Exhibit C at 65. However, on August 1, 1996, she saw a television news report showing a picture of Gilbert, "saying there was a nurse at the VA hospital in Northampton that was being investigated." *Id.* at 66.[3] This report captured Cutting's attention because she immediately recognized the VAMC as the same hospital where Kenneth had died. *Id.* On August 1, 1996, Cutting contacted the VAMC "demanding to know exactly what ward and what shift were being investigated regarding the higher than usual number of cardiac arrests," and requested Kenneth's medical records. *Id.*, Exhibit F. Unsatisfied with the VAMC's response, Cutting contacted a lawyer. *Id.*, Exhibit C at 66.

Cutting's first lawyer obtained Kenneth's medical records, and sent them to her. *Id.* at 67. From these, Cutting learned that Gilbert was looking after Kenneth the week of his death. *Id.* Plaintiff filed her administrative tort claim with the Department of Veterans Affairs on May 20, 1998.

Nancy Cutting's conduct provides a template for reasonable promptness under the discovery rule in these cases. She first had an indication of impropriety at the VAMC possibly involving her husband (beyond the suspicious facts of his death) in August of 1996; she immediately obtained records and demanded an explana-

---

3. As noted below, Exhibit F of document 28, Civil Action 99–40065, shows that Cutting contacted the VAMC for more information about the investigation on August 1, 1996. Since Cutting's testimony that she first saw

the television report in the first week of August has not been challenged, the court infers that Cutting viewed the news report on or about August 1, 1996.

tion. Receiving no satisfactory response, she contacted a lawyer and filed her administrative claim well within two years.

The Government's argument that her claim was time-barred is unpersuasive. It is true, as defendant points out, that the Cutting claim was facially time-barred because Kenneth died February 2, 1996, and the administrative claim was not filed until after February 2, 1998. However, the only evidence available to this plaintiff of the cause of her husband's injury prior to May 20, 1996 (two years before the administrative claim was filed) was that (1) Kenneth had died; and (2) "cardiac arrest" was listed as one cause of death, despite the fact that Kenneth had no history of heart problems. As discussed above, these facts, alone, were insufficient as a matter of law to put plaintiff on inquiry notice. Without more, plaintiff was entitled to rely on the cause of death listed on Kenneth's death certificate.

As noted, the Cutting claim accrued on August 1, 1996, the date Nancy Cutting first had reason to know of the connection between her husband's death and the acts of VAMC employees; plaintiff filed her administrative claim on May 20, 1998, less than two years later, in compliance with the statute of limitations. Since the court has subject-matter jurisdiction over Civil Action No. 99–40065, the motion to dismiss that complaint will be denied.

B. *Rauch (Civil Action No. 99–30231)*

Carl Rauch ("Carl") became a resident of the VAMC in February, 1989, and was transferred to the intensive care unit on October 1, 1995. (Civil Action No. 99–30231, Docket 18 at 1). He suffered a sudden cardiopulmonary arrest on October 2, 1995. *Id.* On October 12, 1995, Carl suffered two more heart attacks that led to his death. *Id.* at 1–2. The death certificate listed "myocardial infarction," a sudden insufficiency of blood supply to the heart, *see Stedman's Medical Dictionary* 868, 1167 (26th ed.1995), as the cause of death. *Id.*, Docket 17, Exhibit C. During his prior six and one-half years at the VAMC, Carl had no heart problems. *Id.*, Exhibit B at 44.

Plaintiff Francis B. Rauch ("Rauch") was almost immediately informed of his brother's death. Rauch had never visited Carl at the VAMC but had kept informed of his condition, *id.* at 33, and was surprised at the cause of death. *Id.* at 44. Rauch felt that "through the years there was no expectancy of [Carl] dying of a heart attack as far as I was concerned." *Id.*

Rauch was aware of newspaper accounts through the summer of 1996 to the effect that there was an investigation ongoing at the VAMC. *Id.*, Docket 17, Exhibit B at 73. While admitting that he was generally aware of the investigation and that "yes, I read the articles," Rauch could not confirm that he read any specific stories. *Id.* at 72–73, 75. Rauch was, however, aware in 1996 that "a nurse" at the VAMC was the target of the investigation. *Id.* at 74–76.

The *Daily Hampshire Gazette*, a Northampton newspaper circulating generally in and around Hampshire county, published multiple in-depth articles on the VAMC investigation in the summer of 1996. Several articles that were obviously available to Rauch offered a striking amount of detail.

A July 17, 1996, article with the headline "VA officials probe deaths" revealed that "[a] federal probe into 'a higher than usual numbers of deaths' from cardiac arrest on one ward" of the VAMC was underway. *Id.*, Docket 17, Exhibit E. That article noted that "foul play" could not be "ruled in or ruled out" at that time. *Id.*

On August 1, 1996, an article with the headline "VA nurse said a focus of the

probe," disclosed·that "investigators probing deaths at the U.S. Department of Veterans Affairs Medical Center are studying the role a nurse played in the care of those that died." *Id.*, Exhibit F. The article noted that while the unnamed nurse had not yet been charged with a crime, she was placed on leave "at about the same time that the VA's Office of Inspector General was called in to investigate what officials feared was a greater number of deaths due to cardiac arrest occurring on a particular ward during a particular shift than on others." *Id.* The same article made it known that the nurse in question had been arrested for trespassing, breaking and entering, and possession of burglary tools, and that her name appeared on the medical records of one veteran who had unexpectedly died of a cardiac arrest. *Id.*

An August 8, 1996 article with the headline "Federal Grand Jury Involved: Probe of VA Deaths Broadens," reported that a Grand Jury had been taking testimony for about a month. *Id.*, Exhibit G. Welch was quoted, and admitted that the Government had "sufficient information to (have brought) it to a Grand Jury," that "local law enforcement officials were asked to participate in the investigation based on their expertise, especially in homicide cases," and that the investigation was "focusing on deaths that occurred at the VA center between fall 1995 and winter 1996." *Id.*

While Rauch admits to being familiar with the articles describing the investigation in general, he maintains that the "real trigger"—that is, the event that in his mind exposed the VAMC's responsibility for Carl's death—was the November 24, 1998, newspaper headline announcing Gilbert's indictment for murder. *Id.*, Exhibit B at 58.

Unfortunately, a plaintiff's subjective state of mind does not determine the date of accrual of a cause of action under the discovery rule. As the Supreme Court has noted, "the prevailing rule under the Act has not been to postpone the running of the limitations period in malpractice cases until the plaintiff is aware that he has been legally wronged." *Kubrick,* 444 U.S. at 121 n. 8, 100 S.Ct. 352. *See also Attallah,* 955 F.2d at 780 ("The standard set forth by the discovery rule is an objective one.").

Once Rauch became aware of the investigation at the VAMC, he had a duty to "protect himself by seeking advice in the medical and legal community." *Kubrick,* 444 U.S. at 123, 100 S.Ct. 352. By the summer of 1996, Rauch knew that a nurse was being investigated in connection with the unusually high number of cardiac arrests on a particular ward in the VAMC, during a particular time. Like Nancy Cutting, Rauch had a reasonable opportunity to inquire further once these indications of Government responsibility came to light and to file a claim within two years, *i.e.,* by the summer of 1998 at the latest.

This conclusion is supported by Chief Judge Young's opinion in *Heinrich v. Sweet,* 44 F.Supp.2d 408 (D.Mass.1999). There, Judge Young found that the plaintiffs' claims were not barred by the statute of limitations, even though there were existing articles and reports which would have raised plaintiffs' eyebrows. *Id.* at 416. In *Heinrich,* however, the relevant information appeared in rather obscure articles or reports; there was no evidence that the plaintiffs had either read them or had reasonable access to them. *Id.* at 416–417. Judge Young held that "reasonable diligence does not require plaintiffs to scour medical journals." *Id.* at 417.

In this case, the record is clear that Rauch actually did read some of the articles the Government points to, had access to others and was aware of the material facts of the investigation. Thus, his claim

accrued, even with the help of the discovery rule, by August 1996 at the latest. Since no administrative claim was filed until December 23, 1998, more than two years after August, 1996, this court has no subject matter jurisdiction over Civil Action No. 99–30231. The motion to dismiss will be allowed.

## C.  Siska (Civil Action NO. 00–30080)

Angelo Vella ("Vella") checked into the VAMC in February, 1996, after going to the emergency room when his stepdaughter, JoAnn Sell ("Sell"), a nurse, noticed that he looked "swollen and edematous" and "was having difficulty breathing." (Civil Action No. 00–30080, Docket 19, Exhibit A at 876). On February 4, 1996, Sell received a phone call from the VAMC advising her that Vella had suffered a cardiac arrest. *Id.*, at 878. The family immediately traveled to the VAMC to see him. *Id.*

Unlike the other plaintiffs, Vella survived his cardiac incident for almost a year, and was able to inform his family how it happened, providing exact details as to Gilbert's involvement.[4] Several members of the family recounted what Vella told them and were important witness during the Gilbert criminal trial. According to Sell, Vella "was quite cognizant .... He was very alert, not—he didn't seem to be confused at all." *Id.*, Docket 19, Exhibit A at 883.

Mary Vella, Vella's other daughter ("Mary"), described her conversation with Vella in the following way:

Q: When you say that he said, "It happened when she [Gilbert] put something in my arm," did he describe what that process was, what had happened?

A: He said that, well, when she put something in his arm his legs began to become numb and his arms became numb and he felt like his heart was going to explode.

*Id.*, at 860. Sell recounted the conversation in her Grand Jury testimony, as follows:

A: He said the nurse was, had come in, and she was putting some kind of medication in his IV with a syringe which he felt was a routine thing that she was supposed to do. He didn't know. And he said that during the period while she was doing the injection, he felt really flushed and hot, and then he started to feel stomach pain and chest pain, and he just remembers another nurse, Frank, coming in the room and yelling something about taking the IV out, and then everything kind of went foggy and he didn't remember anything after that.

　*　　*　　*　　*　　*　　*

Q: When you heard the news, I mean, how did you react to that?

A: I thought it was kind of really strange. I said, I thought to myself either it's an awful coincidence or something isn't quite right here.

*Id.*, Docket 19, Exhibit D at 8–9.

Vella's wife, Carol Vella ("Carol") recalled what Vella told her the next day about the incident: "he said he felt Kristen Gilbert made an error and accidently injected him with the wrong stuff and that she had personal problems and he did not want to jeopardize his care at the V.A. by reporting this." *Id.*, Exhibit E. Vella's brother-in-law, Siska, who is also the named plaintiff and executor of Vella's estate, visited Vella after the cardiac arrest.

---

**4.**  Vella ultimately died on February 2, 1997.

During that visit, Vella "complained of a burning sensation in his arm after receiving an injection from a nurse." *Id.*, Exhibit F. Siska noted that "[m]y sister Carol, and my nieces were aware of [the incident]." *Id.*

After Vella was discharged, Carol received a call from an investigator, who identified herself and asked Carol questions about what happened that night. Carol explained that she was not present, and passed the phone to Vella. Vella indicated that he got "good care" at the VAMC, and declined to get involved. *Id.*, Exhibit G at 26–27. Carol informed Sell of this call, and Sell confronted Vella. Sell testified in the Grand Jury proceedings:

> My mom had indicated that there was some, someone had called her regarding an incident at the VA, and they wanted to talk to [Vella]. I asked [Vella] what it was about, and he said they were talking about when he had the cardiac arrest and with the IV, flushing the IV, or whatever the nurse was doing with the IV. And I said to Angelo: "You know, it's really bizarre, and it's very unlikely that you would have an arrest during a procedure like that of flushing an IV with normal saline. You really should just talk to them. Maybe it's nothing, but you really should, you know, talk to these people," and he refused.

*Id.*, Exhibit D at 10. Vella explained to his stepdaughter that "[h]e was very happy with his care at the VA. He didn't want anything to disrupt it. He, he just felt if he made any waves, he, he felt he wouldn't get the same kind of care." *Id.*

With these facts, it is clear that Vella knew (1) that he had been injured and (2) that the cause of his injury was an injection of some substance by Kristen Gilbert, by early February 1996. Vella's family knew the same within hours or days: Vella felt "like his heart was going to explode"

as Gilbert was injecting him, and he had a heart attack. Within seconds of being injured, Vella was in "possession of the critical facts that he has been hurt and who has inflicted the injury." *Kubrick*, 444 U.S. at 122, 100 S.Ct. 352. A straightforward application of *Kubrick* confirms that this cause of action accrued on February 4, 1996, when Vella described the details of Gilbert's attack to his family. From that date he had two years to file an administrative claim. No such claim was filed, however, until March of 1999.

Plaintiff argues that, until Gilbert's indictment, neither Vella nor his family members realized that he had been the subject of a *criminal* attack, or were sure that the heart attack did not occur naturally. Indeed, unlike the other decedents, Vella did have preexisting heart problems. (Docket 22, Exhibit 4 at 39). While it may be true that plaintiff's knowledge fell short of subjective certainty, the Supreme Court has made it clear that Congress did not intend to postpone the accrual of a claim until plaintiff is subjectively aware that he was wronged. *Kubrick*, 444 U.S. at 123, 100 S.Ct. 352. As noted above, the cause of the injury must have been "inherently unknowable" before the discovery rule will apply. When the victim himself survives an attack, and describes it to family members with the level of specificity provided by decedent in this case, the discovery rule is simply unavailable to extend the limitations period.

In sum, since the court has no subject-matter jurisdiction over Civil Action No. 00–30080, the motion to dismiss must be allowed.

### D. *McEwen (Civil Action No. 99–30232)*

Ralph McEwen ("Ralph") presented himself to the VAMC on December 13, 1995, with complaints of shortness of breath. (C.A. 99–30232, Docket 18 at 1).

At 6:15 p.m., he developed ventricular tachycardia and suffered ventricular fibrillation, but was successfully defibrillated. *Id.* At 8:00 p.m., Ralph had another similar cardiac episode and died. *Id.* at 1–2.

At the time of Ralph's death, Ralph's brother, Warren McEwen ("Warren") was acting on behalf of the estate. *Id.*, Docket 17, Exhibit B at 47, 66. Warren, living in Florida, was officially designated Ralph's "First next of Kin," and was the only individual who Ralph indicated should be contacted by the VAMC in an emergency. *Id.*, Exhibit C. Warren came to Massachusetts after Ralph's death for "a couple weeks," and Warren informed the VAMC of the name of the funeral home. *Id.*, Exhibit D.

In September, 1996, Warren was contacted by the Associated Press about his brother's death as part of the media inquiry into the ongoing investigation. As a result, Warren wrote a letter to the Department of Veterans Affairs dated September 30, 1996. The letter included the following passage:

> On December 13, 1995, Ralph L. McEwen died at the Northampton V.A. Hospital, Northampton, Massachusetts. I was named as his next of kin and traveled to Massachusetts to handle his funeral. . . . My main concern with my brother's death was brought up by a contact last week with a phone call from the Associated Press in Springfield, Massachusetts. I was informed that there is some questionable aspects to the deaths of a number of veterans being treated in the Northampton facility over the past few years prior to Ralph's death in December 1995. These deaths appear to involve an unusually high number of heart attacks. . . . If, as the reporter from the Associated Press informed me that a governmental review of the Northampton medical practices is

being reviewed I request the results of this study be sent to me. I hope I will receive a response to this inquiry in the near future.

*Id.*, Exhibit F. Bruce Gordon, the Medical Center Director, replied by letter on November 20, 1996. His only response to Warren's inquiry about the investigation was contained in the following paragraph:

> Regarding the telephone call you received from a member of the Associated Press in Springfield, Massachusetts claiming that there are some questionable aspects to a number of death of veterans treated at Northampton, I can only respond that an investigation is being conducted and consequently I am unable to comment further at this time. No results of the investigation may be released until the investigation is completed.

*Id.*, Exhibit G. Warren does not deny that he received this letter.

This correspondence indicates that by the end of 1996, around the time Warren received the letter from Director Gordon, the cause of Ralph McEwen's death was no longer "inherently unknowable." By that time, Warren had knowledge that an investigation was going forward into the unusual number of cardiac related deaths at the VAMC, and that there were some "questionable aspects" related to his brother's death. Warren's wife remembered that Kristen Gilbert was Ralph's nurse, *id.*, Docket 19, Exhibit D at 56, and Warren could have learned from the newspaper accounts that a nurse at the VAMC was under investigation. There can be little question that at this time, Warren had "some indication that there may have been a government cause of the injury." *Diaz*, 165 F.3d at 1340. To preserve the rights of the estate, he had a duty to inquire further and file a claim within the following two years.

Plaintiffs argue that, while Warren should perhaps have known of the likely connection between the VAMC and Ralph's death by the end of 1996, the lawsuit's accrual date should be calculated based on the knowledge of the actual plaintiff. In this case, Ralph's son, Michael McEwen ("McEwen"), became the administrator of Ralph's estate, not Warren. McEwen contends that he never heard about Warren's exchange with the Department of Veterans Affairs and claims that he knew nothing whatsoever about any investigation until the indictments were announced in 1998. Docket 17, Exhibit B at 86.

McEwen was able to maintain this ignorance because he had not seen his father for "a couple of years" before his death, although he lived 45 miles from the VAMC in Shirley, Massachusetts. *Id.* at 19. McEwen never visited because, as he explained, "[t]here was some hard feelings about people in [Ralph's] life that he had in his life now. It was just better to keep that separate." *Id.* at 34. Although they spoke on the telephone between once a month and once every four months, *id.* at 35, McEwen was not listed as a person to contact in case of emergency, and did not have much to do with arranging the funeral. McEwen confessed that "[Ralph] and his brother were very close. And at the time I was a little bit undependable." *Id.* at 47.

Thus, only Warren was contacted by the Associated Press, and the record is devoid of evidence that Michael McEwen knew about the VAMC investigation. McEwen claims that he did not read the *Daily Hampshire Gazette*, and denies having any other knowledge of the investigation. Prior to 1998, McEwen knew only that his father had died of a heart attack at the VAMC. Although he was "surprised" because he thought his father "looked great and wasn't heavy, quit smoking a few years back," *id.* at 48–49, that surprise was not sufficient in itself to put McEwen on inquiry notice.

Unfortunately, the authorities make clear that the discovery rule is meant to protect "blameless ignorance," not ignorance achieved by isolation from the decedent. Warren had accumulated information about the investigation and his brother's death, and information about the pendency of the investigation was readily available, by the end of 1996. Nevertheless, plaintiffs in this case did not file their administrative claim until March 18, 1999, more than two years after their claim accrued. The motion to dismiss Civil Action No. 99–30232 must therefore be allowed.

E.  *Skwira (Civil Action No. 00–30192)*

Edward Skwira ("Edward") started rehabilitative treatment for alcohol abuse in February, 1996, and was transferred to the VAMC on February 15, 1996. (Civil Action No. 00–30192, Docket 16, Exhibit B at 5267–5268). That day, Edward experienced a severe cardiac event, a dissecting aneurysm, *id.*, Exhibit C at 12, and the family was told to prepare for his death. *Id.*, Exhibit B at 5277. Edward died on February 18, 1996. *Id.*, Docket 17 at 1.

The plaintiffs are members of Edward's family, who were with Edward throughout this time. They are Statia Skwira, Edward's widow, as administratrix of the estate, Marsha Yarrows, Edward's daughter ("Yarrows"), Edward Skwira, Jr., Edward's son ("Edward Jr."), and Phillip Skwira, Edward's other son ("Phillip").

Following Edward's death, the family discussed having an autopsy done. *Id.*, Docket 16, Exhibit C at 16. They were surprised that Edward had died of heart complications at the VAMC when he was not admitted for heart problems, and they

suspected that Edward's care at the VAMC was inadequate. *Id.*, Exhibit D at 16.

In the summer of 1996, Yarrows began reading about the murder investigation at the VAMC in the newspaper. *Id.*, Exhibit B at 9888. She testified that after reading those reports, "it was like a lightbulb went off because I knew that was exactly what had happened to my father...." *Id.* Yarrows explained that after reading the newspaper clippings,

> It—it really bothered me, and even though my father's name wasn't mentioned as being one of the people who was investigated, I knew right then and there that that was exactly what had happened to him, that he was one of the people that they must be investigating the death of.

Docket 16, Exhibit B at 10093.

As it turned out, Yarrows was not the only party wondering whether Edward had been murdered. In October 1996, investigators, including State Trooper Kevin Murphy ("Trooper Murphy") and Assistant United States Attorney Welch ("Welch"), met with the Skwira family and sought permission to exhume Skwira's body. Trooper Murphy testified that at this meeting, "we explained to her that we had reviewed the case and that our medical people had some concerns that perhaps Mr. Skwira did not die of natural causes." *Id.*, Exhibit H at 12. Welch added that he "told her there had been an increase in deaths and that people were looking at it, to determine whether it was natural or—or something else had been going on." *Id.*, Docket 18, Exhibit D at 29.

In essence, Welch relayed that investigators needed "to figure out whether something wrong had happened, [but] ... it didn't necessarily mean that something wrong had not [sic] occurred to Edward." *Id.*, Docket 18, Exhibit D at 23. Welch

tried to talk about the Government's suspicions with Skwira as neutrally as possible because he "did not want to heighten her expectations or make her believe that something suspicious had happened when, you know, just two weeks later we could have an autopsy that completely ruled out any suspicious cause of death." *Id.* at 24. The family gave them permission to exhume and autopsy the body on November 7, 1996. *Id.*, Docket 16, Exhibits J and K.

In November of 1996, the day after the autopsy and exhumation, Welch attended Edwards' reinterrment. *Id.*, Docket 18, Exhibit D at 26. When Skwira asked Welch about the results of the autopsy, he informed her that "the death certificate as printed was incorrect." *Id.* at 26–27. Welch emphasized that Edward "didn't die of a heart attack," although he quickly added that "did not mean that he did die of—of unnatural causes ...." *Id.* at 27. Welch promised to keep Skwira informed. *Id.*

In July of 1997, Welch met again with Skwira and Phillip. In this meeting, he informed them that the authorities "had found ketamine in certain toxicological samples for Edward Skwira, that the presence of the ketamine was a surprise." *Id.* at 10. The ketamine in Edward's body was not a lethal dose, however, and Welch mentioned it to Skwira mainly to ask her about possible reasons that Skwira might have ketamine in his system, and to keep her informed. *Id.* at 11. Skwira re-inquired about the results of the autopsy generally, and Welch re-affirmed that the death certificate was incorrect, although the Government still could not rule out that Edward had died of natural causes. *Id.* at 14–15. The July meeting was essentially a fact gathering meeting; at the time, the Government wanted to know Edward's entire medical history. *Id.* at 30.

Until 1998, Skwira and her family took no action on their own and relied on Welch. Skwira reports that,

> We cooperated with them completely throughout their investigation, and during the trial. We supplied all information they requested. We believed that they were working diligently on whatever they were doing, and we were told by them that they would provide us with such evidence as they could about the results of the autopsy when it was available to them. They also said they would tell us about the results of their investigations when it was possible to do so.

*Id.*, Exhibit C ¶ 8. Skwira called regularly to check with Welch but did not conduct an investigation of her own or consult with a lawyer. *Id.*

The Skwira family was not conclusively told that Edward had *not* died of natural causes until June, 1998. *Id.*, Exhibit D at 6. This was also the first time they were told that epinephrine was found in Edward's body. *Id.* at 7. Plaintiffs contend that the discovery rule tolled the statute of limitations until this time. They filed their administrative claim on October 8, 1999.

Unfortunately, the clear legal standards discussed above make it unavoidable that plaintiffs' cause of action accrued no later than Skwira's conversation with Welch in November, 1996.

In the summer of 1996, Yarrows became aware of the investigation at the VAMC and began to suspect that her father had died from foul play. Indeed, it would be hard to fashion a metaphor that more clearly conveys the moment when a cause of action will accrue for purposes of the discovery rule than when, as Yarrows put it, "a light bulb went off," suggesting VAMC responsibility for her father's death.

The circumstances outlined above, giving plaintiffs detailed knowledge of the ongoing investigation, all confirm that the cause of injury was by no means inherently unknowable by the end of 1996.

As the First Circuit has recently stated, "the limitations period begins to run regardless of whether plaintiffs make inquiries, and regardless of whether they are correctly advised." *Gonzalez,* 284 F.3d at 289. The limitations clock does not toll pending the outcome of a Government investigation. "Once a plaintiff knows of the injury and its probable cause, he/she bears the responsibility of inquiring among the medical and legal communities about whether he/she was wronged and should take legal action." *Id.* at 289. Plaintiffs knew in 1996 that Edward did not die as the VAMC said he did, and that there was an investigation targeting a VAMC nurse over the unusually high number of cardiac related deaths. Their "ability to investigate" was not "thwarted by ignorance of the details . . . ." *Rotella,* 528 U.S. at 557, 120 S.Ct. 1075.

Admittedly, plaintiffs would not have been able to prove (or possibly even learn) in 1996 that Kristen Gilbert had killed Edward specifically by injecting him with epinephrin. However, it is unquestioned that within the two-year statute of limitations the plaintiffs could have learned enough to file a claim against the VAMC, like Cutting and the other plaintiffs not subject to this motion. *See Childers Oil Co. v. Exxon Corp.,* 960 F.2d 1265, 1272 (4th Cir.1992)(observing that plaintiff "may not know enough to win a verdict or even file a complaint on that first day, but that is why the law gives him a reasonable limitations period to investigate."). Plaintiffs did not file their administrative complaint until October 8, 1999, well more than two years after the claim accrued in 1996. Therefore, this court is without subject

matter jurisdiction over Civil Action No. 00–30192 and must allow the Government's motion to dismiss.

### F. Lessard (Civil Action No. 00–30076 )

Stanley Jagodowsi ("Stanley") was a diabetic, and was admitted to the VAMC on July 21, 1995 for post-operative care following an above-the-knee amputation. (Civil Action No. 00–30076, Docket 14, Exhibit A at 176–177). Stanley was found on the floor August 21, 1995 after suffering a heart attack, and died a little after midnight on August 22, 1995. *Id.*, Docket 16, Exhibit A at 2.

Stanley was survived by his wife, Claire Jagodowski ("Jagodowski"), and his daughter Susan Lessard ("Lessard"). After the amputation, Lessard thought that Stanley "was looking great," that he was "wonderful … his mood was better. He was eating. He was generally happy. His pain was gone." *Id.*, Docket 16, Exhibit B at 41. Plaintiff was surprised by Stanley's death because he had been doing well, *id.* at 64–65, but she recognized that he was not a robust man. In addition to the amputation, he suffered from adult-onset diabetes and may have suffered from a stroke in 1995. *Id.* at 34–38.

Jagodowski was interviewed by the media in connection with the Gilbert investigation, and was quoted twice as, in essence, "wanting answers." On July 18, 1996, the *Springfield Union News* reported as follows:

> Family members of patients whose deaths are being probed by federal investigators at the U.S. Veterans Affairs Medical Center in Leeds wondered yesterday whether their kin may have been victims of foul play, but officials would neither confirm nor deny that criminally administered drugs could have caused a rash of fatal heart attacks at the hospital.

> "If there's anything fishy, I want to know," said Claire Jagodowski of Holyoke. Her husband, Stanley, a 66–year–old Korean War Army veteran, died of cardiac arrest at the medical center last August 22

> \*    \*    \*    \*    \*    \*

> But, sources at the sprawling federal facility said that word has circulated there about inventory discrepancies involving the drug epinephrin.

> \*    \*    \*    \*    \*    \*

> Dr. John Zimmerman, a cardiologist at Medical West in Chicopee, said the drug epinephrin, when injected, can cause cardiac arrest in high dosage.

*Id.*, Docket 14, Exhibit F. The evening of July 18, 1996, Jagodowski was featured in an 11:00 Channel 22 news story in Springfield. According to the transcript, the broadcast proceeded as follows:

> Dan Elias, anchor: In other news tonight, a Holyoke widow wonders this evening if the cause of her husband's death is suspicious. Sixty-six-year-old Claire Jagodowski still mourns the loss of her husband Stanley. He died last year while at the VA hospital in Northampton. An unusually high number of heart attack deaths at the hospital has sparked a federal investigation. Jagodowski says, although her husband had many illnesses, he did die of a heart attack, and now she wonders.

> Claire Jagodowski (Husband Died At Veterans Affairs ·Hospital): Care was not free. Most people are—most of the people up there are compassionate individuals. However, there are some that have mean streaks. And not knowing what floor this occurred on and what ward, that I'm very interested to find out, where these people were dying.

Elias: Federal investigators were expected back on hospital grounds next week to further their probe.

Docket 14, Exhibit G.

Jagodowski was also interviewed by Special Agent Timothy Bond ("Bond") on August 30, 1996. Jagodowski told him she was contacted by "Brad Smith and the newspapers in Springfield, Holyoke, Boston Herald and Channel 22," and "by a woman regarding a Class Action Suit," and that Claire "had seen the articles in the newspapers about Ward C." (Docket 14, Exhibit D). Jagodowski informed Bond that Gilbert was one of Stanley's nurses. *Id.*

Jagodowski's memory of these interviews, and of what she knew in 1996, was hazy during her deposition. *Id.*, Docket 16, Exhibit C at 40–52. Similarly, Lessard could not recall whether she was aware of the Gilbert investigation in 1996, and could not recall whether her mother had told her about any of her news interviews or appearances. *Id.*, Exhibit B at 55–59. However, neither denied that the interviews took place, that they were aware of the investigation, or that Jagodowski read the articles in which she was quoted. Jagodowski also did not deny that she spoke with Agent Bond or dispute his version of the substance of their conversation.

Thus, given these interviews, it cannot be doubted that Jagodowski knew: (1) that an investigation was under way at the VAMC; (2) that it centered on Gilbert; (3) that Gilbert was Stanley's nurse; (4) that there might be something "fishy" about the rash of cardiac-related deaths on Ward C; (5) that some persons were contemplating a class action lawsuit, and (6) that the drug epinephrine was suspected. In light of this information, it cannot plausibly be argued that the cause of Stanley's death was inherently unknowable as of late 1996.

Unfortunately, plaintiff did not file her administrative claim until September 29, 1999. Therefore, this court has no subject matter jurisdiction over Civil Action No. 00–30076, and the claim must be dismissed.

## V. CONCLUSION

For the reasons set forth above, defendant's motion to dismiss as to plaintiff Cutting (Civil Action No. 99–40065) is hereby DENIED. Defendant's motions to dismiss as to plaintiffs Rauch (Civil Action No. 99–30231), Siska (Civil Action No. 00–30080), McEwen (Civil Action No. 99–30232), Skwira (Civil Action No. 00–30192), and Lessard (Civil Action No. 00–30076) are hereby ALLOWED.

This court's close familiarity with the suffering already endured by the families of some of these plaintiffs makes these orders of dismissal especially distasteful. Unfortunately, the rulings appear to be mandated by controlling authority. Nevertheless, since the decisional law governing the discovery rule is less than crystal clear on all points, and appears to be continuing to evolve, counsel may want to consider the possibility of appeal with special care.

Separate orders will issue.

## ORDER

For the reasons stated in the accompanying Memorandum, defendant's motion to dismiss (Docket No. 28) is DENIED. The clerk will set a date for a status conference to set a schedule for future proceedings.

It is So Ordered.

## ORDER

For the reasons stated in the accompanying Memorandum, defendant's motion to dismiss (Docket No. 17) is ALLOWED.

The clerk will enter judgment for the defendant.

It is So Ordered.

### ORDER

For the reasons stated in the accompanying Memorandum, defendant's motion to dismiss (Docket No. 19) is ALLOWED. The clerk will enter judgment for the defendant.

It is So Ordered.

### ORDER

For the reasons stated in the accompanying Memorandum, defendant's motion to dismiss (Docket No. 17) is ALLOWED. The clerk will enter judgment for the defendant.

It is So Ordered.

### ORDER

For the reasons stated in the accompanying Memorandum, defendant's motion to dismiss (Docket No. 16) is ALLOWED. The clerk will enter judgment for the defendant.

It is So Ordered.

### ORDER

For the reasons stated in the accompanying Memorandum, defendant's motion to dismiss (Docket No. 14) is ALLOWED. The clerk will enter judgment for the defendant.

It is So Ordered.