Edward **BENNETT, as administrator of the Estate of William Frederick Bennett, Plaintiff,**

v.

**FEDERAL BUREAU OF INVESTIGA-TION, H. Paul Rico, and the United States of America, Defendants.**

No. CIV.A. 02–11802–RCL.

United States District Court,
D. Massachusetts.

Aug. 21, 2003.

Stacey Bosshardt, U.S. Department of Justice, Torts Branch, Civil Division, Washington, DC, for Federal Bureau of Investigation, USA, Defendants.

Frank C. Corso, Law Office of Frank C. Corso, Boston, for Edward Bennett, Plaintiff.

Margaret Krawiec, U.S. Department of Justice, Torts Branch, Civil Division, Washington, DC, for Federal Bureau of Investigation, USA, Defendants.

Dean A. Mazzone, Attorney General's Office, Boston, for Attorney General of Massachusetts, District Attorneys for the

Suffolk, Norfolk, and Middlesex Districts of Massachusetts, Interested Partys.

E. Peter Parker, Boston, for H. Paul Rico, Defendant.

Peter J. Perroni, Nolan/Perroni, LLP, Lowell, for Edward Bennett, Plaintiff.

### MEMORANDUM AND ORDER ON UNITED STATES' MOTION TO DISMISS

LINDSAY, District Judge.

### I. Introduction

This is a suit filed by the Estate (the "Estate") of William Frederick Bennett ("William Bennett"), of which William Bennett's son Edward is the administrator (the "plaintiff"). Named as defendants are the United States of America ("United States"); H. Paul Rico ("Rico"), who at the times relevant to the complaint was an agent of the Federal Bureau of Investigation ("FBI"); and the FBI itself. The plaintiff's claims, as set forth in the first amended complaint (the "complaint"), arise from the December 1967 homicide of William Bennett, allegedly at the hands of Stephen J. Flemmi ("Flemmi") often called in the Boston press, at least, by the moniker "The Rifleman." Flemmi was associated with the Winter Hill Gang, an alleged criminal organization operating in the Boston area. The complaint is in two counts: the first count, asserted against all the defendants, is brought under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671–2680; the second, asserted against Rico only, is a *Bivens* claim. Each count seeks to hold the defendants liable for William Bennett's wrongful death

and conscious suffering under Massachusetts state law.

This memorandum and order addresses the motion of the United States to dismiss claims against it and the FBI for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1). The motion asserts that the plaintiff cannot make a claim against the United States for its alleged role in causing William Bennett's death because the administrative notice of claim required by the FTCA was not timely filed.[1] The United States further argues that the FBI is not a proper defendant in this action, and that the claims against the FBI should therefore be dismissed. The plaintiff does not contest this latter point, but counters with regard to the United States' first argument that the notice of claim filed in September of 2001 was timely because certain acts of the FBI constituted a pattern of fraudulent concealment, thus tolling the FTCA limitations period. For the reasons stated below, I DENY the United States' motion with respect to the FTCA claims against the United States itself and GRANT the motion with respect to the FBI.

### II. Background

*A. Factual Background.*

Unless otherwise noted, the following facts are drawn from the complaint.

In 1965, Flemmi was recruited by Rico to serve as a confidential informant for the FBI. Compl. ¶¶ 9, 10. Rico believed that Flemmi could provide information useful in the FBI's investigation of the organized crime enterprise known as La Cosa Nostra (the "LCN"). *Id.* ¶ 12. Rico knew that Flemmi, a reputed murderer, and at least

---

1. 28 U.S.C. § 2401(b) states that "[a] tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless ac-

tion is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented."

one of William Bennett's brothers were associated with the Winter Hill Gang. *Id.* ¶¶ 14–16. In exchange for assistance in the investigation intended to bring down the LCN, Rico promised Flemmi that he would not reveal his cooperation with the government to anyone outside of the FBI. *Id.* ¶ 18. Rico also promised Flemmi that the FBI would not investigate or prosecute him for any crimes Flemmi might commit while he acted as an informant. *Id.* ¶¶ 20, 29.

One of the crimes allegedly committed by Flemmi during the course of his relationship with the FBI was the murder of William Bennett's brother, Edward "Wimpy" Bennett. The plaintiff alleges that Flemmi told Rico about his involvement in Edward Bennett's death, and that Rico subsequently filed a false report with the FBI, indicating falsely that Flemmi told him that others were responsible for the murder. *Id.* ¶¶ 22–24. Upon Edward Bennett's death, Flemmi took over the criminal operations his victim had formerly supervised. Notwithstanding Flemmi's involvement in this murder and his day-to-day operation of a criminal enterprise, the FBI promoted him to Top Echelon informant status. *Id.* ¶¶ 22, 25.

Sometime in 1967, Rico visited William Bennett's home looking for papers relating to the activities of Edward Bennett and a third Bennett brother who allegedly had also been murdered by Flemmi. The complaint alleges that Rico's purpose in this visit was to obtain information that would assist Flemmi in his conduct of criminal activities. *Id.* ¶¶ 31–32. The complaint alleges further that on December 23, 1967, Flemmi murdered William Bennett. *Id.* ¶ 35. The plaintiff claims Rico assisted and participated in the death of William Bennett in order to strengthen Flemmi's position in his criminal operations, thus assuring the continuing flow of information

regarding the LCN to the FBI, by way of Flemmi's underworld connections. *Id.* ¶¶ 37–38. Thereafter, Rico continued to insulate Flemmi from investigation and prosecution for his crimes. *Id.* ¶ 39. The plaintiff asserts that the defendants deliberately, fraudulently or otherwise concealed the truth regarding the FBI's protection of Flemmi. *Id.* ¶ 42.

## B. *Procedural History.*

A few words are in order regarding the criminal cases brought in connection with William Bennett's death: Flemmi and another prominent figure reputed to be involved in the Boston organized crime scene, Francis "Cadillac Frank" Salemme ("Salemme"), were indicted for William Bennett's murder in 1969, approximately two years following the murder. (Memorandum in Support of United States' Motion to Dismiss (hereinafter "Mot. to Dismiss")), at 3. Subsequently, Flemmi and Salemme departed Boston and became fugitives. *United States v. Salemme,* 91 F.Supp.2d 141, 183 (D.Mass.1999). In 1974, Flemmi returned to Boston and the Bennett murder charge (among others) was dropped, just as the same charge against Salemme had earlier been dropped. *Id.* at 185. The pair were indicted again in 1996. Mot. to Dismiss at 3.

According to the briefs submitted in this case, the plaintiff filed a presentment of claim under the FTCA on September 10, 2001. Plaintiff's Opposition to Motion to Dismiss (hereinafter "Pl. Opp.") at 7. The United States argues that this case should be dismissed because, for purposes of the FTCA, the Estate's claim had most likely accrued by December 23, 1969 (two years from the date of William Bennett's death) and in any event earlier than the September 10, 1999 cutoff implied by the 2001 filing date. The disagreement between the plaintiff and the United States as to

when the cause of action accrued is at the center of the dispute before me; I address it in several parts below.

### III. FTCA Claim Against the United States.

#### A. Legal Standard.

The motion before me is a motion to dismiss for lack of subject matter jurisdiction. In evaluating such a motion, I must view the plaintiff's well-pleaded factual allegations as true and draw all reasonable inferences therefrom. *Muniz–Rivera v. United States*, 326 F.3d 8, 11 (1st Cir. 2003). In addition, I may consider the complaint, affidavits or other sources of uncontested facts in reaching my conclusion as to whether subject matter jurisdiction has been properly asserted. *Valentin v. Hospital Bella Vista*, 254 F.3d 358, 363 (1st Cir.2001).

With regard to the plaintiff's substantive claims, I begin with the fundamental principle that no case can be asserted against the United States without its consent. The FTCA represents a compromise that allows plaintiffs to file tort claims against the United States in federal court so long as they first file administrative claims with the appropriate agency within two years after their tort claims accrue. 28 U.S.C. § 2401(b); *see also United States v. Kubrick*, 444 U.S. 111, 117–18, 100 S.Ct. 352, 357, 62 L.Ed.2d 259 (1979); *Attallah v. United States*, 955 F.2d 776, 779 (1st Cir. 1992); *Cutting v. United States*, 204 F.Supp.2d 216, 221 (D.Mass.2002). The filing of a timely administrative claim under 28 U.S.C. § 2401(b) is a jurisdictional requirement that cannot be waived. *Gonzalez v. United States*, 284 F.3d 281, 288 (1st Cir.2002). Therefore, should a plaintiff fail to file a timely administrative claim, any action filed in court must be dismissed. *Id.*

The United States alleges that the plaintiff's administrative claim of September 10, 2001 was untimely filed, and that the claims asserted in the complaint are therefore time-barred and must be dismissed. Mot. to Dismiss at 7. The plaintiff argues that the claims are timely because they did not accrue for FTCA purposes until some time in 2000. *See* Pl. Opp. at 7. Alternatively, the plaintiff argues that the doctrines of fraudulent concealment and equitable tolling should be applied to toll the FTCA statute of limitations. *Id.* at 15.

#### B. Accrual of FTCA Claims.

■ Under the FTCA, the general rule is that a claim accrues at the time of injury. *See Gonzalez*, 284 F.3d at 288. Under this rule, the United States argues, the plaintiff's claim accrued on December 23, 1967— the date of William Bennett's murder— and therefore the administrative claim should have been filed by December 23, 1969. *See* Compl. at ¶ 35; Mot. to Dismiss at 9. To support this proposition, the United States applies the principle set forth in *Kubrick* and relies on *Richman v. United States*, 709 F.2d 122 (1st Cir.1983) and *Zeleznik v. United States*, 770 F.2d 20 (3rd Cir.1985), cases that applied the general rule. Mot. to Dismiss at 9–11.

*i. The Discovery Rule.* In *Kubrick*, the Supreme Court distinguished situations involving application of the general rule from those involving application of the so-called discovery rule. *See Kubrick*, 444 U.S. at 122, 100 S.Ct. at 359. The Court indicated that an exception to the general rule of accrual of a claim at the time of injury is to be applied in those situations where the plaintiff did not know he or she had been injured, or where the facts regarding causation were unavailable to the plaintiff or were difficult to obtain. *See id.* The Court stated that the general rule is to be

applied where a plaintiff may be ignorant of his or her legal rights, but is "in possession of the critical facts that he [sic] has been hurt and who has inflicted the injury." *Id.* The First Circuit has indicated that the standard in determining applicability of the discovery rule is objective—that is to say, the factual basis, including the fact of injury and knowledge as to its probable cause—must have been "inherently unknowable" at the time of the injury. *See Gonzalez,* 284 F.3d at 288–89. "Inherently unknowable" is defined as "incapable of detection by the wronged party through the exercise of reasonable diligence." *Id.*

■ *ii. Applicability of Discovery Rule in Wrongful Death Cases.* The United States raises a fundamental challenge to the application of the discovery rule in wrongful death claims, arguing that the Supreme Court has only expressly approved the application of the discovery rule in limited contexts, such as cases involving latent disease and medical malpractice, or cases in which fraudulent concealment is found. Mot. to Dismiss at 11–12 (citing *TRW Inc. v. Andrews,* 534 U.S. 19, 27, 122 S.Ct. 441, 446–47, 151 L.Ed.2d 339 (2001)). However, as I noted in an earlier case related to allegations of FBI misconduct, *Donahue v. FBI,* 204 F.Supp.2d 169, 176 (D.Mass.2002), the Supreme Court has not "expressly rejected the use of the discovery rule in the context" of a wrongful death case. *Id.* at 176. Moreover, recent First Circuit case law indicates that "the discovery rule is not limited to those situations spelled out by the Supreme Court." *Id.; see also Gonzalez,* 284 F.3d at 288–89. Another district court, in the *Cutting* case, declined to find the discovery rule inapplicable in the wrongful death context absent clearer appellate authority. The *Cutting* court noted that it would "not assume that the applica-

tion of the discovery rule in the wrongful death context is unwarranted, simply because no Supreme Court of First Circuit case contains an explicit holding to that effect." *Cutting,* 204 F.Supp.2d at 224. As I held in *Donahue,* I conclude in this case that the discovery rule properly may be applied to wrongful death cases in this circuit.

■ *iii. Bennett Claims: General Rule or Discovery Rule?* The United States contends that the plaintiff knew of the fact of the injury—William Bennett's death—and the fact that it had been caused by murder on December 23, 1967. Mot. to Dismiss at 9. Flemmi and Salemme were indicted for this crime in 1969. Furthermore, the United States asserts that the admission by William Bennett, Jr. ("Bennett, Jr.") in an August 27, 1998, BOSTON HERALD article that he witnessed FBI Agents visit his family's home and threaten his father days before the murder, Mot. to Dismiss, Ex. 2 (Peter Gelzinis, *Slain Man's Son: My Family Treated 'Stevie' Like Kin,* BOSTON HERALD, Aug. 27, 1998 at 10 ("Gelzinis Article")), is evidence that Bennett, Jr. immediately suspected FBI involvement in his father's murder. Therefore, the United States argues, the plaintiff's administrative claim should have been filed by December 23, 1969. *Id.*

The plaintiff argues that Bennett, Jr. did not in the late 1960's believe—nor could he have believed—that the FBI was responsible for the death of his father based upon the 1967 visit his father received from the FBI. Pl. Opp. at 13 n. 8. The argument advanced by the plaintiff is that it cannot reasonably be inferred from the fact that Bennett, Jr., then a teenager, overheard the conversation between his father and agents of the FBI—agents whose identities were not known to Bennett, Jr. at the time—that Bennett, Jr. knew or should

have suspected that agents were involved in or responsible for the subsequent crime. *See id.*

The cases relied upon by the United States in arguing that, even the application of the discovery rule would require an administrative claim filed after December 23, 1969 to be viewed as untimely, are distinguishable from the case before me. In both the *Richman* and *Zeleznik* cases, the identity of the assailants was known at the time of the injury.[2] Similarly, in the present case, Flemmi and Salemme were indicted for William Bennett's murder less than two years after the murder. Although the murder charge was dropped against both five years later, the two were indicted again for the murder in 1996, and members of William Bennett's family, including Edward Bennett, state that they continued to believe that Flemmi and Salemme were the sole causes of William Bennett's murder until July of 2000 at the earliest. *See* E. Bennett Aff.; W. Bennett Aff. The subject matter unknown to the plaintiffs in both *Richman* and *Zeleznik* was the connection of the assailant with a federal agency, which the plaintiffs in each case did not discover until the two-year period for filing an FTCA claim had elapsed. According to the appellate panels of the First and Third Circuits deciding *Richman* and *Zeleznik*, respectively, the plaintiffs' knowledge of the identity of the tortfeasors provided them with sufficient information to investigate the tortfeasors' "legally recognized affiliations." *Liuzzo v. United States*, 485 F.Supp. 1274, 1283 (E.D.Mich.1980). The court in *Richman* stated that "[the plaintiff] simply . . . did not realize there was another party she might be able to make a claim against," likening her situation to one in which a plaintiff has a duty to inquire as to other parties who may be responsible in tort through vicarious liability. *Richman*, 709 F.2d at 123. Thus, in *Richman*, the basis for the plaintiff's claims was not "inherently unknowable" according to the First Circuit's application of the discovery rule. Similarly, the Third Circuit in *Zeleznik* found no reason to deviate from the standard set forth in the "general rule," standard absent a showing that the government "actively conceal[ed]" its own wrongdoing. *Zeleznik*, 770 F.2d at 23.

Although the plaintiff in the present case was aware of his father's murder and believed that Flemmi and Salemme were his killers during the late 1960's, the knowledge of the identity of the immediate tortfeasors did not then put the plaintiff (or other potential plaintiffs) on notice that the FBI might have some responsibility for William Bennett's death. After all, the FBI is generally thought to be concerned with *law enforcement* and not an outlaw itself.[3] Moreover, the focus of the investigation of the murder of William Bennett— to the extent that any investigation was made—remained exclusively on Flemmi

---

2. In *Richman*, the plaintiff was assaulted and seriously injured by one George Chalpin, who had been treated by a Veterans' Administration hospital for emotional stress before his encounter with the plaintiff. *Richman*, 709 F.2d at 123. In *Zeleznik*, the plaintiff's son was murdered by one Vernal Walford, whom the INS had failed to detain despite his efforts to turn himself in as an illegal alien before he committed the murder. *Zeleznik*, 770 F.2d at 21–22.

3. The Gelzinis Article quotes Bennett, Jr. as having said that he thought, at the time of the 1967 visitation to his home by FBI agents that "[t]hese [the FBI agents] are supposed to be the good guys," and having remembered William Bennett saying: "No, no, they are not the good guys." This latter remark of William Bennett is ambiguous at best, given that William Bennett himself was thought by the FBI to have been involved in criminal activities and might well have been a target of legitimate FBI law enforcement activities.

and Salemme until decades later. W. Bennett Aff. at ¶ 7; Pl. Opp. at 15 (noting FBI, through the *Salemme* hearings, only "slowly and grudgingly" gave up information relating to the agency's wrongful conduct).[4] The Bennetts had no reason to suspect that either individual murderer was somehow improperly connected with the FBI because this information was concealed by the FBI itself. Compl. at ¶ 18 (stating Rico promised Flemmi his FBI informant status would remain confidential); *id.* at ¶ 24 (alleging Rico filed false reports to divert attention away from Flemmi's criminal activities in order to preserve his informant status). Furthermore, the surviving Bennetts have stated that they believed Flemmi and Salemme were the sole causes of the murder. E. Bennett Aff. at ¶ 6; W. Bennett Aff. at ¶ 5. The allegations that Rico promised to conceal Flemmi's status as an informant as well as the criminal acts Flemmi continued to commit while acting as an informant, together with allegations that Rico impeded the investigation of William Bennett's

murder, make a strong case that the FBI's involvement was "inherently unknowable" and "incapable of detection by the wronged party through the exercise of reasonable diligence" at the time of the murder. *Gonzalez,* 284 F.3d at 288–89; *see* Compl. at ¶¶ 18, 24, 36.

The government's position evidently is that, through the exercise of reasonable diligence in the period from 1967–69, representatives of the Estate should have discovered facts that would lead them to suspect that there was some relationship of an officially sanctioned nature between Flemmi and the FBI such that there might exist an FTCA claim.[5] Though the discovery rule does not preclude accrual of a claim until a plaintiff is in possession of all the facts necessary to state a cause of action, *see Cutting,* 204 F.Supp.2d at 225, I find in this case that mere knowledge that Flemmi was Bennett's murderer was insufficient to trigger the Estate's duty to inquire before the end of 1969. "Some-

---

**4.** It was during the course of the *Salemme* hearings that Flemmi raised as a defense his understanding that he would not be prosecuted for crimes committed during his tenure as an FBI informant. *See Salemme,* 91 F.Supp.2d at 315–17. This assertion began the inquiry by Judge Mark Wolf of this district that culminated in hundreds of pages of findings revealing for the first time the details of the FBI's involvement with the Winter Hill Gang.

**5.** I note, as an aside, that the full story of Flemmi's relationship with the FBI remains a work in progress. No fewer than six of the thirteen active judges of this district have had criminal and civil cases, during the last few years, that have related in some way to the relationship between the FBI and members of the Winter Hill Gang. Several of these cases are ongoing. I have had thirteen of such cases, twelve of which are ongoing.

In addition, Congress continues to this day an investigation into what went wrong when the Boston office of the FBI began to work with the Winter Hill Gang. A reputed leader of the Winter Hill Gang, James J. "Whitey" Bulger, remains a fugitive from justice as of this writing, and as recently as June of this year, James Bulger's brother William was called to testify before a congressional panel investigating the connection between the FBI and the Winter Hill Gang. William Bulger's testimony that he had no information to offer regarding his brother's whereabouts, and had no contact with the fugitive since shortly after his disappearance, sparked a controversy that shortly led to William Bulger's tender of his resignation as the president of the University of Massachusetts. *See* Shelley Murphy, *Loyalty to 'Whitey' Cost Brothers, Some Say Legal Trouble, Resignation Linked to Fugitive Brother,* THE BOSTON GLOBE, Aug. 11, 2003 at B1. Thus, the position of the United States position that, in 1969, the plaintiff in this case should have suspected that the FBI had formed an alliance with organized crime figures when this fact was apparently unknown to government officials outside of the FBI can be met with nothing short of incredulity.

thing else [is] needed to trigger accrual" where a reasonable—and seemingly final—explanation of the cause of the plaintiff's injury presents itself. *Id.* In *Cutting*, the deaths of the patients at a Veterans' Administration hospital from cardiac arrest did not give their survivors "some indication that there may have been a government cause of the injury." *Id.* at 224 (quoting *Diaz v. United States*, 165 F.3d 1337, 1340 (11th Cir.1999)) (internal quotation marks omitted). After all, the victims in the *Cutting* case would not have been in a hospital had they not been ill. Similarly, Flemmi was known to have been engaged in criminal activities, and had taken over Edward Bennett's illegal enterprises upon the latter's death. I conclude that, in the late 1960's, a potential plaintiff representing the Estate and exercising reasonable diligence would be under no obligation to look further than to the acts of a known violent criminal to discover the cause of William Bennett's death. The discovery rule therefore applies to this cause of action. *See Donahue*, 204 F.Supp.2d at 175–77.

I contrast this situation to another case arising out of the FBI's longstanding entanglement with Flemmi and his criminal cohorts. John L. McIntyre was allegedly murdered by Winter Hill Gang members in November of 1984, after he began providing information to the United States Customs Service about James Bulger's involvement in the shipment of weapons to paramilitary groups in Ireland. *McIntyre v. United States*, 254 F.Supp.2d, 183, 184–85 (D.Mass.2003). McIntyre's mother, Emily, immediately suspected government involvement in her son's death, even going so far as to hire a lawyer to investigate any possible claims and then writing a book detailing her theory that the Customs Service, possibly in collusion with the British intelligence agency MI–6, engineered John McIntyre's murder. *Id.* at 185–86.

That it was later alleged that the FBI, and not the Customs Service, that sheltered McIntyre's murderers from prosecution—and allegedly may even have incited his killing by revealing his informant status—was of no consequence. Emily McIntyre never believed that her son's death was the result of circumstances truly free of government involvement, as the plaintiffs initially did in *Cutting* and as the surviving Bennetts here believed for many years. In any event, Emily McIntyre's claim was undone not by her mistaken belief that Customs, and not FBI, agents were at fault, but by the fact that a BOSTON HERALD article (the truth of which she did not deny) placed her in Judge Wolf's courtroom on a day when testimony was delivered in the *Salemme* hearings by a DEA agent who voiced suspicions that the FBI had compromised criminal investigations of Bulger and Flemmi—"precisely one of the allegations made in [Emily McIntyre's] case." *McIntyre*, 254 F.Supp.2d at 192. She filed her administrative claim more than two years from the date of that hearing, and the claim in *McIntyre* was thus time-barred because actual notice to McIntyre's estate of facts that would spark investigation by a properly diligent plaintiff had been documented in the Boston press. I discuss the effect of press reports on the Bennetts' claims *infra*, but conclude that the *McIntyre* case presents a wholly distinguishable set of facts.

### C. *Accrual Under the Discovery Rule.*

The conclusion above begs the question, if the claim did not accrue by 1969, when *did* the plaintiff discover the existence of a potential FTCA claim? According to the papers filed by the plaintiff, Edward Bennett first became aware of the alleged role of the FBI in dealing with Flemmi and his associate James Bulger in July of 2000,

when someone sent him a clipping from the BOSTON HERALD describing a ruling in the *Salemme* case issued by Judge Wolf. *See* E. Bennett Aff. at 7. Edward Bennett, who, by that time, had been living in New Mexico for approximately twenty years, was prompted by the newspaper article to find out more about the *Salemme* case, and he began to make inquiries as to whether the activities of the defendants in that case had any connection with his father's murder. As part of his inquiries, Edward Bennett submitted a Freedom of Information Act, or FOIA, request for records relating to the FBI's investigation of his father's death. He was informed via letter from the FBI's Boston office that "no main file records responsive to [his] FOIA request" were located upon a search of the "manual indices to the central records system maintained in the Boston office[.]" Ex. B to E. Bennett Aff. (Correspondence between Edward Bennett and FBI Boston office). Assuming for the moment that Edward Bennett did exercise reasonable diligence in pursuing and investigating the Estate's claim once he received the article, the September 10, 2001 administrative filing falls well within the two-year period for filing that began to run in July of 2000, when he claims to have received actual notice of the connection between Flemmi and the FBI.

However, this does not end the inquiry, as the United States contends that no reasonable plaintiff could have remained unaware of the potential connection between the FBI and Flemmi until mid–2000. Moreover, the United States argues that the Estate actually knew of the potential existence of a claim by August of 1998, when Bennett, Jr. was quoted in the Gelzinis Article, and that any knowledge possessed by Bennett, Jr. should be attributed to the Estate as plaintiff, notwithstanding Edward Bennett's declaration that he was not aware of the proceedings in the *Salemme* case until July of 2000.

    *i. Attribution of William Bennett, Jr.'s Knowledge to Estate.* The plaintiff contends that the deadline for filing an administrative claim should not run from any alleged notice of a potential claim to Bennett, Jr. because only the knowledge of the named plaintiff should be assessed in determining when the Estate's claim accrues. Pl. Opp. at 7. The plaintiff's brief cites Massachusetts law that provides that, under the wrongful death statute, Mass. Gen. Laws ch. 229, §§ 2 & 6, only the executor or administrator of a deceased person's estate may bring an action for wrongful death, and the statute of limitations accrues only against the executor or administrator. Pl.Opp. at 8–9. Thus, the plaintiff argues, the cause of action in this case accrued only when the administrator, Edward Bennett, discovered or in the exercise of reasonable diligence should have discovered the factual basis for the FTCA claim. *Id.* at 9–10. Alternatively, the plaintiff argues that even if Bennett, Jr.'s knowledge can be imputed to the Estate in some way, the proper result would be to alter the amount of recovery payable to Bennett, Jr. rather than to cut off the rights of all other beneficiaries of the Estate. *Id.* at 10. The United States counters that federal law controls accrual of FTCA claims, and that the knowledge of any potential plaintiff is imputed to the Estate. United States' Reply to Plaintiff's Opposition to Motion to Dismiss ("Reply") at 5–6. As discussed above in the context of the analysis of whether the general rule or the discovery rule applies here, the determination as to when a claim under the FTCA accrues is to be made with reference to federal law. *See McLellan Highway Corp. v. United States,* 95 F.Supp.2d 1, 13 (D.Mass.2000) (applying federal rule to determine when cause of action accrues under FTCA); *Heinrich v.*

*Sweet,* 44 F.Supp.2d 408, 415 n. 8 (D.Mass. 1999) (stating determination of when claim accrues under FTCA is question of federal law). I therefore confine my analysis to federal law, the plaintiff's reliance on Massachusetts precedent notwithstanding.

■ Applying principles enunciated in federal cases, I conclude that it is appropriate to evaluate Bennett, Jr.'s knowledge in assessing accrual of the instant claim, regardless of the fact that he is not the named plaintiff in the present action. Bennett, Jr., as a surviving son of William Bennett, had full authority to file the administrative claim with the FBI. *See Booten v. United States,* 95 F.Supp.2d 37, 42 (D.Mass.2000) (stating statutory beneficiary under wrongful death statute has full authority to file administrative claim). The court in *Wozniak v. United States,* 701 F.Supp. 259, 260–61 (D.Mass.1988), held that 28 C.F.R. § 14.3 [6] permits the filing of an administrative claim under the FTCA by individuals who are beneficiaries under the applicable state wrongful death statute. Bennett, Jr. is such a beneficiary. *See* Mass. Gen. Laws ch. 229, § 1.[7] Moreover, Bennett, Jr., as "next of kin," is a potential administrator of his father's estate, and therefore, a potential plaintiff in the present action. *See* Mass. Gen. Laws ch. 193, § 1.

Another court in this district reached a similar result: in *Cutting,* the named plaintiffs knew less about government culpability in their decedent's death than did other potential administrators and family members. *Cutting,* 204 F.Supp.2d at 227.

The plaintiffs claimed that only the knowledge of the named plaintiff is relevant in determining accrual of claims under the FTCA. *Id.* Judge Ponsor responded:

No support exists for this argument, and it flies in the face of both of applicable authority and practicality. No statute of limitations would have meaning if it were possible to avoid it simply by appointing a putative Rip Van Winkle as the estate administrator and plaintiff. . . . Thus the discovery rule does not require recalculation of the statute of limitations in light of the subjective knowledge, or ignorance, of each potential plaintiff. The exception applies only when the cause of action is "inherently unknowable," . . . not when it merely happens to be unknown by a particular potential plaintiff.

*Id.*

■ *ii. "Reasonable Diligence" and Media Reports.* Having determined that Bennett, Jr.'s knowledge can be used to determine the time at which the plaintiff's claim accrued, I must now address the argument of the United States that a plaintiff with this knowledge, exercising reasonable diligence, should have been aware of facts triggering a duty to investigate and file an administrative claim prior to September 10, 2001. "Once a plaintiff knows of the injury and its probable cause, he/she bears the responsibility of inquiring . . . about whether he/she was wronged and should take legal action." *Gonzalez,* 284 F.3d at 289. The limitations period begins to run once a plaintiff has sufficient

---

**6.** 28 C.F.R. § 14.3(c) states: "A claim based on death may be presented by the executor or administrator of the decedent's estate, or by any other person legally entitled to assert such a claim in accordance with applicable State law."

**7.** I note as well that the original complaint defined the "plaintiff" as "the estate of Wil-

liam [Frederick] Bennett including his children, William Bennett, Edward Bennett and Walter Bennett." Original Compl. Intro. The complaint was later amended to read: "The plaintiff is Edward Bennett, as Administrator of the Estate of William Frederick Bennett." Compl. (as amended) Intro.

facts to inquire into a possible claim, regardless of whether or not any actual inquiry occurs. *See Kubrick,* 444 U.S. at 123, 100 S.Ct. at 360; *Gonzalez,* 284 F.3d at 291 n. 10.

The facts in *Heinrich, Cutting* and *Donahue* specifically involved information regarding causation that was contained in media reports. In *Heinrich,* Chief Judge Young refused to impute to the plaintiffs knowledge of factual information contained in medical journal articles that indicated a possible connection between the experiments in which the victims participated and their deaths. *Heinrich,* 44 F.Supp.2d at 417. There was no evidence that the plaintiffs had actually read the articles, and Judge Young concluded that due diligence did not require laypeople to scour obscure medical journals. *Id. Cutting* and *Donahue* dealt with mainstream media. In *Cutting,* Judge Ponsor determined that plaintiff Cutting's claims against a Veterans' Administration hospital for her husband's wrongful death were timely because as soon as she saw a television report regarding an investigation into the activities of a nurse at the hospital in which her husband had died, she requested his medical records, inquired into the investigation, contacted a lawyer, and filed her administrative claim within two years of viewing the report. *Cutting,* 204 F.Supp.2d at 228. By contrast, the claim of another plaintiff in the *Cutting* case was deemed to have accrued before he learned of the nurse's criminal indictment. That plaintiff had become aware of several news articles discussing an investigation seeking a link between the nurse and a high number of cardiac deaths at the hospital where his brother died of cardiac arrest. *Id.* at 230–31. Since the second plaintiff filed his administrative claim more than two years after he became aware of the articles, his claim was not timely. *Id.* In *Donahue,* I concluded that knowledge of the content of

certain media reports published more than two years before the plaintiffs' claim was filed should not be imputed to the plaintiffs for purposes of triggering a duty on their part to inquire. *Donahue,* 204 F.Supp.2d at 176–77. Of particular relevance in making that assessment were the facts that the media reports were published sixteen years subsequent to the death of the plaintiffs' decedent and thirteen years subsequent to the indictment of a third party for the murder, and that the third party, who was not an FBI informant, was tried for, and then acquitted of, the murder. *Id.* at 177–78.

In the present case, the United States argues that even if the Bennetts' claim did not accrue on December 23, 1967, they did know, or in the exercise of reasonable diligence should have known, enough information to bring a claim well before September 10, 1999—the accrual date implied by the date on which their administrative claim was filed. Mot. to Dismiss at 13. This argument is premised on quotations attributed to Bennett, Jr. in the Gelzinis Article that he connected his father's murder with FBI misconduct and was looking for a lawyer to sue the FBI. *Id.* at 12. (This is a matter to which I will return in Part III.D of this memorandum and order.) The United States also asserts that the Bennetts had actual knowledge that Flemmi had been charged twice with William Bennett's murder; that details of Flemmi's relationship with the FBI had been widely reported; and that testimony from the *Salemme* case linking the FBI and Flemmi to William Bennett's murder had also received extensive media attention. *Id.* at 13. Thus, the United States argues that by the mid–1980's or late 1990's, the basis for the plaintiff's claim was not "inherently unknowable," such that a reasonable plaintiff would not have discovered it. Reply at 3. The plaintiff

responds that none of the media reports provided the Estate with notice of the critical facts forming the basis of its claim, and, that in any event, the surviving Bennetts did not have actual knowledge of the media reports. Pl. Opp. at 12. Thus, the plaintiff argues, knowledge of the facts contained in those reports should not be imputed to the named plaintiff through Bennett, Jr.

The United States has provided me with copies of several newspaper articles which began appearing in Boston's newspapers as early as 1985. The earliest of these reports make a connection between Flemmi and William Bennett's murder. *See, e.g.,* Mot. to Dismiss, Ex. 3 (William F. Doherty and Richard J. Connolly, *Angiulo Lawyer Questions Audibility of Tapes,* THE BOSTON GLOBE, Nov. 21, 1985 at 46 (noting receipt by organized crime figure of coded message from Flemmi indicating William Bennett had been murdered)). Later reports, postdating the 1996 indictment of Flemmi and Salemme, both suggested a connection between the FBI and Flemmi and reiterated the allegation that Flemmi killed William Bennett. *See, e.g.,* Mot. to Dismiss, Ex. 3 (Ralph Ranalli, *Mobster: I Had License to Kill: Flemmi Says FBI Knew He Was a Murderer,* BOSTON HERALD, Jan. 7, 1998 at 6) (noting Flemmi's admission that he had a "free pass on murder" and the fact that the 1969 Bennett murder charge had been dropped). I note, however, that many articles published after 1998 also report express denials by the FBI of any improper relationship between Flemmi and agents of the FBI. *See, e.g.,* Pl. Opp. at 16 (citing David Weber, *Flemmi's Lawyer Contends Fed Let His Crimes Slide,* BOSTON HERALD, Jan. 14, 1998 at 10 (stating Rico denied making promise to Flemmi to block prosecution of claims); Patricia Nealon, *Ex-Agent Denies Tipping Off Flemmi,* THE BOSTON GLOBE, Jan. 15, 1998 at B4 (report-ing Rico denied alerting Flemmi to upcoming indictment and in playing role in dismissing charges)). Both Bennett, Jr. and Edward Bennett explicitly deny seeing, reading or hearing about any of the media reports cited by the United States, including those recounting testimony at the *Salemme* hearings. E. Bennett Aff. at ¶¶ 15–16 (stating he had not read any newspaper articles prior to July 2000 in relation to Flemmi, the FBI, or his father's death); W. Bennett Aff. at ¶¶ 3–4 (stating he had not read any newspaper articles prior to July 2000 regarding the relationship between the FBI and his father's death).

The United States argues that the surviving Bennetts' failure to read these articles is unavailing, as the media reports were so widely available that a plaintiff exercising reasonable diligence should have discovered them, thus triggering a duty to inquire about potential FTCA claims. I am not persuaded, however, that the earliest articles cited by the United States—those simply connecting William Bennett's murder with Flemmi's activities—would have added anything to the actual or constructive knowledge of the surviving Bennetts had they actually read them. It is only the later articles, in which a suggestion is made of Flemmi's operating under an informally conferred FBI license to kill, that would put a reader on notice of the FBI's possible involvement in the Bennett murder.

As to the later media reports, I do not find that the failure of Edward Bennett and Bennett, Jr. to become aware of these media reports is indicative of a lack of due diligence on their parts. Moreover, as in the *Cutting* case, where plaintiff Cutting filed her administrative claim within two years of learning of her potential cause of action because of information in a media report, the plaintiff in this case filed a

timely administrative claim.[8] *See Cutting,* 204 F.Supp.2d at 228. In the *Donahue* case, I concluded that the significant amount of time between the death of the plaintiffs' decedent and the publication of the media reports at issue lent support to the plaintiffs' claims that they did not act unreasonably by failing to keep track of items in the Boston press. *See Donahue,* 204 F.Supp.2d at 177–78. William Bennett was murdered in 1967, and it was not until 1998 that extensive press coverage began to report Judge Wolf's findings that agents of the FBI were aware of crimes Flemmi committed while serving as an FBI informant or promised him immunity (as he has claimed) from prosecution in exchange for information. The period in which Flemmi was an informant is alleged to comprise some thirty years. Although the Bennetts knew from 1969 that Flemmi was a suspect in the murder—whereas the *Donahue* plaintiffs believed that someone other than an FBI informant murdered their decedent—the law does not require the Bennetts to have monitored press reports indefinitely from the day they became aware of the suspect's identity, particularly where they deny any knowledge prior to the year 2000 that Flemmi was acting as an FBI informant. Additionally, Edward Bennett has lived in New Mexico since the early 1970s, and Bennett, Jr., has resided in Florida since 1978. (Of the other Bennetts who survived the decedent, a daughter, Robin, passed away in 1985, and his widow in 2001. It is not clear where William Bennett's widow, Louise, lived prior to her death; nor is it clear where a third

son, Walter Bennett, resides.) The standard by which a potential FTCA claimant is deemed to have acted with due diligence is one of reasonableness, and I conclude that given the passage of time and their distance from Boston, it is not unreasonable for Bennett, Jr. and Edward Bennett to have been unaware of the media reports that began to circulate in the late 1990s. *See Orlikow v. United States,* 682 F.Supp. 77, 85 (D.D.C.1988) (stating "newspaper articles containing allegations do not necessarily place citizens on notice when there is no evidence that these articles were read."); *see also Donahue,* 204 F.Supp.2d at 177 (same).

### D. *Fraudulent Concealment.*

█ Despite the statements made by Edward Bennett and Bennett, Jr., with regard to the date at which they became aware of their potential claim, I agree with the United States that mid–2000 is not the initial date from which the Estate's claim should run: Bennett, Jr. concedes that he was contacted by a reporter in late summer 1998 about the "mess in Boston" and states that he was then urged to contact the FBI. W. Bennett Aff. at ¶¶ 5–6. He also states that it was at this time that he learned that Flemmi was an FBI informant. *Id.* at ¶ 5. The Gelzinis Article was then published with his comments recalling the 1967 incident in which FBI agents spoke with his father and stating his plan to sue the FBI. Even accepting the facts in the complaint as true and drawing all reasonable conclusions therefrom, I find that

---

**8.** An article dated July 6, 2000 contains the first indisputably affirmative indication that the potential claim was known to Bennett, Jr. Mot. to Dismiss, Ex. 2 (Peter Gelzinis, *Feds Betray Bennett Family Once Again,* BOSTON HERALD, Jul. 6, 2000 at 1 (stating "There's no doubt whatsoever in my mind that Paul Rico gave my Dad up to Stevie Flemmi . . .")). Another article published on the same day

states "Billy believes his father figured out Flemmi and Salemme were the killers [of the other Bennett brothers], but made the mistake of telling FBI agents, who in turn tipped Flemmi, a longtime FBI informant." Pl. Opp., Ex. 1A (Andrea Estes, *Judge Tosses Evidence Against Flemmi in Deaths of 3 Brothers,* BOSTON HERALD, Jul. 6, 2000 at 4).

Bennett, Jr. should have known in the exercise of reasonable diligence that he had a potential claim against the FBI in August of 1998.

Because Bennett, Jr. discovered or should have discovered the factual basis for an FTCA claim in August of 1998, and because it is proper to impute his knowledge to the Estate, any administrative claim filed by the Bennetts after August of 2000 should be considered untimely. However, there remains another twist in this decades-long story of official cover-ups: I find that the FBI fraudulently concealed evidence of its own involvement in William Bennett's death when Bennett, Jr. began to make inquiries, and that the period for the filing of a notice of administrative claim was therefore tolled.

The plaintiff makes the argument that the doctrines of equitable tolling and fraudulent concealment should act to toll the limitations period for the filing an administrative claim until July of 2000, when Edward Bennett states that he learned of facts that revealed government wrongdoing. Pl. Opp. at 19. Bennett, Jr.'s notice in 1998 of potential FBI involvement, the plaintiff's argument continues, should not set the limitations clock running because when Bennett, Jr. made inquiries of the FBI, the agents to whom he spoke fraudulently concealed information that would have led Bennett, Jr. to conclude that a claim against the United States existed. The United States, relying on an affidavit filed in this case by Bennett Jr., responds that the FBI agents with whom Bennett, Jr. met after August of 1998 stated simply that the investigation was ongoing and that they had no information to share with him at that time. This cannot act to toll the limitations period, the United States argues, because the "mere failure of the alleged wrongdoer to disclose his or her

wrongdoing is not fraudulent concealment." Mot. to Dismiss at 16; Reply at 8.

As an initial matter, I find that the United States' characterization of the facts contained in Bennett, Jr.'s affidavit elides dates and misconstrues crucial details of the conversations reported therein. The United States asserts that the affidavit of Bennett Jr. indicates that a conversation with the unnamed FBI agents in question took place in 1998, when Bennett, Jr. initiated a meeting with two FBI agents at a reporter's suggestion. *Id.* However, it is clear from the affidavit that Bennett, Jr. spoke with agents of the FBI on two separate occasions; while it is unclear exactly when the conversation quoted below took place, it can be stated with some certainty that it occurred at Bennett, Jr.'s first meeting with the FBI, some time after "late summer 1998" and before 2000. In 2000, according to the affidavit, a Drug Enforcement Agency agent named Dan Doherty contacted Bennett, Jr. Doherty, according to Bennett, Jr., stated that murder charges were going to be dropped against Flemmi and Salemme. *See* W. Bennett Aff. at ¶¶ 8–9. The affidavit does not state that Doherty made any representations regarding FBI involvement in Bennett's death, but the affidavit goes on to state that Bennett, Jr. subsequently spoke to agents of the FBI, who stated in this second encounter that they had no information to share. *Id.* at ¶ 9. By contrast, the earlier conversation with the two unnamed FBI agents is reported by Bennett, Jr. as follows:

> I met with two FBI agents who informed me that they were conducting an investigation. They did not inform me who was the subject of the investigation or the specific nature of the investigation ... [T]he agents did assure me, however, that there was *no connection between the conduct of any FBI agents and the death of my father or the failure*

*to convict those responsible for his death.* The Agents also told me very generally and without real explanation, that *any actions by the FBI were "routine" and that FBI agents in the field at the time of my father's death did nothing improper.*

*Id.* at ¶ 6 (emphasis added).

These statements are more than a mere failure to disclose wrongdoing, but an affirmative and categorical denial of wrongdoing that is consistent with what the complaint alleges to have been a secret understanding between Rico and Flemmi that Rico would not reveal Flemmi's cooperation with the FBI and would not seek his prosecution for crimes committed while Flemmi was an FBI informant. *See* Compl. ¶¶ 20, 29.

The doctrine of equitable tolling suspends the running of a statute of limitations "if a plaintiff, in the exercise of reasonable diligence, could not have discovered information essential to the suit." *Gonzalez,* 284 F.3d at 291 (citing *Bernier v. Upjohn Co.,* 144 F.3d 178, 180 (1st Cir.1998)); *see also Miceli v. FBI,* 2002 WL 31654948 at *9 (N.D.Ill. Nov.21, 2002) (indicating equitable tolling requires due diligence to obtain information bearing on existence of claim, not its details). In *Gonzalez,* the court did not find equitable tolling of the statute appropriate, finding that tolling was precluded by a lack of diligence on the part of the plaintiff. The plaintiff, knowing both that her baby was injured and that the probable cause of the injury was medical negligence, failed to inquire into the federal employee status of the potential tortfeasors. *See id.* at 291–92. By contrast, Bennett, Jr.'s affidavit makes it clear that he did inquire about FBI involvement in his father's death after learning of a potential connection in the summer of 1998, and that he gave up the inquiry because he received assurances that reasonably led him to believe that pursuit of the FBI was a dead end.

The closely related doctrine of fraudulent concealment is available "where a plaintiff has been injured by fraud and remains in ignorance of it without any fault or want of diligence or care on his part." *Gonzalez,* 284 F.3d at 292 (quoting *Salois v. Dime Sav. Bank of New York, FSB,* 128 F.3d 20, 25 (1st Cir.1997)) (quotation marks omitted in original); *see also Cogburn v. United States,* 717 F.Supp. 958, 961–62 (D.Mass.1989) (stating plaintiffs must show they were unable to discover concealed information within limitations period despite exercise of reasonable diligence and were thus barred from seeking redress in court). To succeed with such a claim, a plaintiff must show that "1) sufficient facts were [not] available to put a reasonable [person] in the plaintiff['s] position on inquiry notice of the *possibility* of fraud, and 2) plaintiff exercised due diligence in attempting to uncover the factual basis underlying this alleged fraudulent conduct." *Salois,* 128 F.3d at 25–26 (quoting *Maggio v. Gerard Freezer & Ice Co.,* 824 F.2d 123, 128 (1st Cir.1987)). In this case, the plaintiff must show that the United States itself played a role in concealing the identity of the FBI tortfeasors; must plead with particularity the facts surrounding the concealment; and must be able to show due diligence in attempting to uncover those facts. *Gonzalez–Bernal v. United States,* 907 F.2d 246, 250 (1st Cir.1990).

In the *Cogburn* case, the statute of limitations was equitably tolled because the court found that the plaintiff's doctors had falsified medical reports in order to cover up their negligence. *Cogburn,* 717 F.Supp. at 959. At one point, the plaintiff requested and received his falsified medical records, which he provided to an attorney for review. The attorney then advised the plaintiff that he had no basis for a claim of negligence. When the plaintiff

later discovered that the records had been falsified, he immediately filed an administrative claim. *Id.* The court found that because the original records were fraudulently concealed and the plaintiff exercised due diligence by requesting the records and reviewing them to evaluate his potential claims, the limitations period was tolled. *Id.* at 963. In *Gonzalez–Bernal,* the facts were different, and the court did not find the statute tolled as a consequence of fraudulent concealment. *Gonzalez–Bernal,* 907 F.2d at 250. The court noted that "the government is under no obligation to provide private citizens with information concerning ongoing criminal investigations.... 'Fraudulent concealment must consist of affirmative acts or representations which are calculated to, and in fact do, prevent the discovery of the cause of action. Mere silence of the defendant and failure by the plaintiff to learn of the right of action, alone, are not sufficient.' " *Id.* (quoting *Chrysler Workers Ass'n v. Chrysler Corp.,* 663 F.Supp. 1134, 1151 (N.D.Ohio 1986)).

In the present case, the complaint alleges that Rico knew that Flemmi was involved in criminal activities, including murder, while he served as an FBI informant; that Rico filed false reports within the FBI, diverting attention away from Flemmi during criminal investigations; that Rico violated established policies and procedures of the FBI in order to continue the agency's improper relationship with Flemmi; and that the FBI concealed the truth regarding its tortious and wrongful actions for a period beginning before Bennett's murder and extending to the present day. Compl. ¶¶ 15, 24, 40, 42. In addition, Rico expressly denied any wrongdoing in regard to his relationship with Flemmi during the *Salemme* hearings in 1998. Pl. Opp. at 16. Other agents of the FBI made affirmative representations to Bennett, Jr. that there was no connection between the actions of the FBI and his father's death. W. Bennett Aff. at ¶ 6. Finally, the surviving Bennetts state explicitly that they believed the actions of Flemmi and Salemme to be the sole causes of their father's murder until at least July 2000. *Id.* at ¶ 5. I conclude that these facts are sufficient to state a claim that the FBI actively concealed its alleged involvement in the encouragement, or at least condonation, of the criminal acts of Flemmi, including the murder of William Bennett. I therefore conclude that, in keeping with the rule enunciated in *Gonzalez–Bernal* and *Cogburn,* the limitations period was tolled from summer of 1998, when Bennett, Jr. first suspected that he might have a claim and began the inquiry that was stymied by the two unnamed FBI agents, to the summer of 2000, when both Edward Bennett and Bennett, Jr. became aware that evidence of the FBI's longstanding collusion with Flemmi was being presented in connection with the *Salemme* case.[9] Whether this tolling be characterized as "equitable tolling" or tolling due to fraudulent concealment does not matter. The plaintiff has stated a claim for both.

## IV. FBI as Defendant.

An additional point raised in the motion to dismiss is the assertion that claims

---

**9.** Although it makes no difference to the tolling question, I note, *en passant,* that the FBI's response to Edward Bennett's FOIA request is also indicative of stonewalling on an official level. Particularly in light of Judge Wolf's comment in *Salemme* that the FBI "had a motive to tailor, by omission or distortion, the written records that they reasonably expected would never be seen by others," 91 F.Supp.2d at 175, the FBI's letter in February of 2001 stating that the "manual indices to the central records system maintained in the Boston office" turned up no "main file records" regarding the murders of the three elder-generation Bennett brothers only serves to underscore the impression that the FBI has sought to prevent victims of Flemmi's crimes from seeking redress under the FTCA.

brought against the FBI must be dismissed for lack of subject matter jurisdiction, because the FTCA does not permit tort actions to be brought against federal agencies. Mot. to Dismiss at 17; *see* 28 U.S.C. § 1346(b)(1) (providing jurisdiction for claims brought "against the United States"). The plaintiff has not addressed this argument in its opposition brief. Because the law provides that "[t]he authority of any federal agency to sue and be sued in its own name shall not be construed to authorize suits against such federal agency on claims which are cognizable under section 1346(b) of this title, and the remedies provided by this title in such cases shall be exclusive," 28 U.S.C. § 2679(a), no claim cognizable under § 1346(b) of the FTCA may be brought against the relevant federal agency in its own name. *Federal Deposit Insurance Corp. v. Meyer,* 510 U.S. 471, 476, 114 S.Ct. 996, 1001, 127 L.Ed.2d 308 (1994). An action asserted under the FTCA is considered cognizable if it is brought

> against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b).

Since the complaint asserts all the required elements—the claim is one for wrongful death under Massachusetts state law, arising from actions taken by an FBI employee within the scope of his employment and seeking money damages against the United States—this action is cognizable under the FTCA. Therefore, the FTCA remedy is the exclusive remedy, and the

FBI is not a proper defendant. Accordingly, the claims against the FBI are dismissed for lack of subject matter jurisdiction.

### Conclusion.

For the reasons stated above, I hold that the plaintiff's claims, as asserted against the United States, are not time-barred because, by operation of the discovery rule, the claims did not accrue until summer of 1998. Because of the actions by the FBI constituting concealment of essential facts, I further hold that the limitations period was tolled until July of 2000, and the plaintiff's filing on September 10, 2001 of his administrative claim was therefore timely. The motion of the United States to dismiss claims asserted against it is therefore DENIED. With respect to claims asserted against the FBI, I conclude that the remedy provided by the FTCA is exclusive, and the motion to dismiss such claims as they relate to the FBI itself is therefore GRANTED.

SO ORDERED.